993 P.2d 1259 (2000)
Charles CALLOWAY and Marlene Iacometti, on behalf of themselves and other property owners of Huffaker Hills Units 3 and 4 Homeowners' Association, Appellants,
v.
CITY OF RENO, P & H Construction Inc., Clarence Poehland, John Carl Construction Company, Highland Construction, Inc., and Offenhauser Development Company, Respondents.
City of Reno, Cross-Appellant,
v.
Highland Construction, Inc., Offenhauser and Oetjen Construction, Inc., Offenhauser Development Company, Sparks Roofing and Siding Service, Inc., Charles Calloway and Marlene Iacometti on behalf of themselves and other property owners of Huffaker Hills Units 3 and 4 Homeowners' Association, Cross-Respondents.
No. 25628.
Supreme Court of Nevada.
February 29, 2000.
*1261 Robert C. Maddox & Associates, Reno, for Appellants/Cross-Respondents Charles Calloway, Marlene Iacometti, and other property owners of Huffaker Hills.
Lemons, Grundy & Eisenberg, Reno, for Respondent/Cross-Appellant City of Reno.
Beasley, Holden & Kern, Reno, for Respondents P & H Construction, Inc., Clarence Poehland and John Carl Construction Company.
Erickson, Thorpe & Swainston, Ltd. and Thomas Beko, Reno, for Cross-Respondents Highland Construction, Inc. and Offenhauser and Oetjen Construction, Inc.
Haefner & Enzenberger, Reno, for Cross-Respondent Offenhauser Development Company.
Mortimer, Sourwine, Mousel & Sloane, Ltd., Reno, for Cross-Respondent Sparks Roofing and Siding Service, Inc.
Cecilia L. Rosenauer, Reno, for Amici Curiae Consulting Engineers Council of Nevada and Builders Association of Northern Nevada.
BEFORE ROSE, C.J., YOUNG, MAUPIN, SHEARING and AGOSTI, JJ.[1]

OPINION ON REHEARING
By the Court, YOUNG, J.:
On May 22, 1997, this court issued an opinion in the above-captioned appeal affirming in part, reversing in part and remanding the matter to the district court. Calloway v. City of Reno, 113 Nev. 564, 939 P.2d 1020 (1997). Respondents P & H Construction, Inc. (P & H), Clarence Poehland (Poehland), and John Carl Construction Co. (Carl) (collectively referred to as the subcontractors), petitioned this court for rehearing, and the City of Reno (the City) subsequently joined in the petition. On December 3, 1998, we granted rehearing and withdrew our opinion. We now issue this opinion in place of our prior opinion.
For the reasons set forth below, we conclude that the district court properly applied the economic loss doctrine to preclude appellants' negligence claims against the subcontractors and the City. We further conclude that the economic loss doctrine bars appellants' claim in strict products liability, and that the district court properly determined that the structures at issue in this case are not "products" for purposes of strict products liability. Finally, we conclude that we lack jurisdiction to consider the City's cross-appeal.

FACTS
This class action arose from alleged defects in the Huffaker Hills Townhouse Development in Reno. Charles Calloway and Marlene Iacometti are class representatives, representing the class of 164 townhouse owners in Huffaker Hills who brought the action (appellants).
In their original complaint, appellants asserted that their homes were built with defective roofing and siding that was responsible *1262 for extensive water damage from rain and snow. That complaint named Offenhauser Development Company, Highland Construction, Inc. (collectively referred to as the developer and contractor), and Sparks Roofing and Siding Service, Inc. (Sparks Roofing and Siding), all Nevada corporations, as defendants. Pursuant to NRCP 10(a), the complaint also named thirty fictitious individuals or entities as Doe defendants. Appellants sought recovery based upon breach of express and implied warranties, negligence, strict liability, fraud and misrepresentation.
Thereafter, appellants amended their complaint four times during the next two years. The first amended complaint omitted appellants' claims for fraud and misrepresentation against the developer and contractor. Appellants' second amended complaint named the City, among others, as a defendant. The claim against the City was based upon negligent inspection of construction. In particular, appellants asserted that the City approved the construction with actual knowledge of the alleged defects. The third amended complaint added Gardner Plumbing and Heating (Gardner), and Cavallero Heating and Air Conditioning, Inc. (Cavallero), as defendants. Additionally, the third amended complaint set forth allegations of construction defects related to roofing, framing, plumbing, and heating and air conditioning.
In the interim, the developer and contractor, pursuant to NRCP 14(a), filed a first amended third party complaint naming P & H and Poehland as third party defendants. Ultimately, all third party claims and/or cross-claims filed by the developer and contractor were dismissed without prejudice pursuant to the stipulation of the parties. Subsequently, appellants moved the district court for an order permitting the amendment of the complaint to name the subcontractors in place of fictitiously named Doe defendants as entities responsible for the framing of the townhouses. The district court granted appellants' motions, and thereafter, appellants filed their fourth, and final, amended complaint adding the subcontractors as defendants. The claims against the subcontractors were based on defective framing. Appellants sought recovery against the subcontractors on theories of breach of express and implied warranties, negligence, and strict liability.
The subcontractors moved the district court for summary judgment on appellants' claims against them. The district court, applying the economic loss doctrine, granted the subcontractors' motion for summary judgment after determining that recovery for pure economic loss was not appropriate in negligence and that plaintiffs had to rely on their contractual remedies to recover for economic losses. Accordingly, the district court limited appellants' claims against the subcontractors and the City to recovery in contract, or for personal injury or harm to property in tort, and concluded that the repairs and replacement costs appellants sought to recover in tort were economic losses not amenable to tort recovery. In addition, the district court summarily dismissed appellants' strict liability claims on the ground that a townhouse is not a product. The district court explained that this court "has not yet pushed Nevada into the fold of those few jurisdictions [that] recognize strict liability for recovery of economic loss" and the district court declined to "lead the way." The district court also summarily dismissed sixty-five members of appellants' class based upon the statutes of repose.
Shortly thereafter, appellants settled their claims against the developer and contractor, and Sparks Roofing and Siding in the amount of $826,500.00. Appellants also settled their claims against Gardner and Cavallero in the amount of $225,000.00. Appellants then voluntarily dismissed their warranty claims and claims for damage to personal property against the subcontractors.
In addition to the claims brought by appellants, the City cross-claimed against the developer and contractor for indemnity and contribution. The developer and contractor moved for summary judgment on the City's cross-claims, and the district court granted the motion.
In this appeal, appellants challenge the district court's use of the economic loss doctrine to preclude their negligence claims *1263 against the subcontractors and the City. Appellants also take issue with the district court's determination that the doctrine of strict liability does not apply to the townhouses at issue here. Additionally, appellants contend that the district court misinterpreted and improperly applied the statutes of repose retroactively to bar the claims of sixty-five appellants whose homes were substantially completed before October 30, 1981. The City has also filed an appeal and challenges the district court's dismissal of its cross-claim for indemnity and contribution against the developer and contractor.

DISCUSSION

I. Standard of review

Under NRCP 56(c), summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Butler v. Bogdanovich, 101 Nev. 449, 705 P.2d 662 (1985). A summary judgment is reviewed de novo. Dermody v. City of Reno, 113 Nev. 207, 931 P.2d 1354 (1997); see also SIIS v. United Exposition Services Co., 109 Nev. 28, 846 P.2d 294 (1993) (summarizing authority for the conclusion that matters of law are reviewed de novo ). On appeal from a summary judgment, this court may "be required to determine whether the law has been correctly perceived and applied by the district court." Mullis v. Nevada National Bank, 98 Nev. 510, 512, 654 P.2d 533, 535 (1982).

II. Application of the economic loss doctrine

A. Overview of the economic loss doctrine

"The economic loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." Sidney R. Barrett, Jr., Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis, 40 S.C.L.Rev. 891, 894 (1989) [hereinafter Construction Defects ]. In determining whether a claim sounds in contract or in tort, the pleadings and the alleged facts must be considered.
A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement. A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract. Torts can, of course, be committed by parties to a contract. The question to be determined ... is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties.
Bernard v. Rockhill Dev. Co., 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987) (quoting Malone v. University of Kansas Medical Center, 220 Kan. 371, 552 P.2d 885, 888 (1976)).
Under the economic loss doctrine "there can be no recovery in tort for purely economic losses." American Law of Products Liability (3d) § 60:39, at 69 (1991). Purely economic loss is generally defined as "the loss of the benefit of the user's bargain ... including... pecuniary damage for inadequate value, the cost of repair and replacement of the defective product, or consequent loss of profits, without any claim of personal injury or damage to other property." Id. § 60:36, at 66.
The economic loss doctrine arose, in large part, from the development of products liability jurisprudence.[2] Early American courts embraced the doctrine of caveat emptor, under which a seller was not liable to the buyer in contract or tort for product defects, unless the seller engaged in fraud or provided an express guarantee. Express and implied warranty theory later developed within the parameters of contract law. See W. Page Keeton et al., Prosser and Keeton on the Law on Torts § 95A, at 679-80 (5th ed.1984) *1264 [hereinafter Prosser and Keeton ]. Thus, liability for economic losses was viewed as contractual, and privity of contract was required. Additionally, fairly negotiated disclaimers on liability were enforceable. Id. at 681. With the subsequent introduction of negligence liability for defective products, buyers could recover from sellers for personal injury and later, property damage. Id. § 96, at 681-82 (citing MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916)).
Negligence was often difficult to prove, however, and courts viewed the manufacturer as being in a better position to pay for injuries. Consequently, courts created the doctrine of strict liability of warranty. After some preliminary decisions from other jurisdictions, the New Jersey Supreme Court decided Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), in which both an automobile manufacturer and dealer were held liable to the purchaser's wife on a theory of implied warranty of safety. "What followed was the most rapid and altogether spectacular overturn of an established rule in the entire history of the law of torts." Prosser and Keeton § 97, at 690. Under the strict liability of warranty doctrine, the seller became the insurer of the ultimate user's safety, and the "citadel of privity" was eradicated. Id. In other words, although recovery was based on warranty, which was intimately connected to contract law, the existence of a contract was not necessary for recovery.
Since such liability far exceeded traditional contractual liability and created confusion between the law of contracts and torts, as well as complications with the Uniform Commercial Code, courts eventually abandoned the doctrine in favor of strict liability in tort. Id. § 99, at 692-94 (citing Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963)).
Because of this doctrinal development, and the resulting confusion created between tort and warranty theories, the economic loss doctrine gained recognition and support. The doctrine serves to distinguish between tort, or duty-based recovery, and contract, or promise-based recovery, and clarifies that economic losses cannot be recovered under a tort theory. See Seely v. White Motor Company, 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965) (concluding that if a defective product causes purely economic harm, tort liability is precluded, in order to preserve the law of warranty). As noted by the United States Supreme Court, "[p]roducts liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty. It is clear, however, that if this development were allowed to progress too far, contract law would drown in a sea of tort." East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (citations omitted). The Supreme Court recognized that maintaining the distinction between contract and tort is consistent with the different purposes behind these theories of recovery:
"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the `luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products."...
The tort concern with safety is reduced when an injury is only to the product itself....
Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value."
Id. at 871-72, 106 S.Ct. 2295 (quoting Seely, 45 Cal.Rptr. 17, 403 P.2d at 151) (other citations omitted).
This court, along with most other jurisdictions, has applied the economic loss doctrine in products liability actions and has recognized the economic loss doctrine's distinction between tort and warranty: "It is true that a plaintiff may not recover economic loss under theories of strict products liability or negligence. However, purely economic loss may be recovered under a breach of warranty theory." Central Bit Supply v. *1265 Waldrop Drilling, 102 Nev. 139, 140-41, 717 P.2d 35, 36-37 (1986) (citation omitted); see generally Arco Prods. Co. v. May, 113 Nev. 1295, 948 P.2d 263 (1997); Nat'l Union Fire Ins. v. Pratt and Whitney, 107 Nev. 535, 815 P.2d 601 (1991); Bernard, 103 Nev. at 135, 734 P.2d at 1240; American Law of Products Liability (3d) § 60:39, at 70.
We have also applied or discussed the economic loss doctrine in other contexts as well. For instance, in Local Joint Executive Board v. Stern, 98 Nev. 409, 651 P.2d 637 (1982), we determined that employees of the MGM Grand Hotel could not recover, under theories of negligence and strict liability, economic losses in the form of lost wages and employment benefits. Later, in Oak Grove Investors v. Bell & Gossett Co., 99 Nev. 616, 625, 668 P.2d 1075, 1080 (1983), we noted that an apartment complex's defective heating and plumbing system, which caused substantial leakage of water throughout the complex and damage to the apartments, did not cause "purely economic losses." We therefore suggested, in dicta, that the action could proceed on claims of negligence and strict liability. Id., 668 P.2d at 1080-81.

B. Application of the economic loss doctrine in construction defects cases

Oak Grove represents the only case in which this court considered whether the economic loss doctrine might preclude tort recovery for damages to a building. Even though Oak Grove suggested that the economic loss doctrine should be considered in such circumstances, this court later stated, in dictum, that the economic loss doctrine should not apply to construction defects cases:
[T]he economic loss doctrine was never intended to apply to construction projects that reflect the products and efforts of so many different manufacturers, laborers, crafts, supervisors and inspectors in the creation of an essentially permanent place of habitation. On the other hand, as will be noted in greater detail hereafter, commercial products that may, for whatever reason, injure themselves are readily insured and suitable for inclusion within the economic loss doctrine.
Pratt and Whitney, 107 Nev. at 539, 815 P.2d at 603. Pratt and Whitney involved litigation over damages to an airplane and had nothing to do with building construction. As the dissent aptly noted, "[w]hile this may be our decision when that issue is presented to us and carefully briefed, we should refrain from making such broad gratuitous legal statements until [the issue is] properly before this court." Id. at 546-47, 815 P.2d at 608 (Rose, J., dissenting).
Although the Pratt and Whitney dictum cogently points out why construction projects should not be considered "products" for the purpose of products liability, this dictum unfortunately blurs the distinction between the economic loss doctrine and products liability. As stated previously, the economic loss doctrine arose, in large part, from the development of products liability, but its application is broader and serves to mintain a distinction between contract and tort principles. See Ramerth v. Hart, 133 Idaho 194, 983 P.2d 848, 851 (1999) (stating that the economic loss doctrine "applies to negligence in general; its application is not restricted to products liability cases").
"The crux of the doctrine is ... the premise that economic interests are protected, if at all, by contract principles, rather than tort principles." Construction Defects at 895. Contract law is designed to enforce the expectancy interests created by agreement between the parties and seeks to enforce standards of quality. "This standard of quality must be defined by reference to that which the parties have agreed upon." Crowder v. Vandendeale, 564 S.W.2d 879, 882 (Mo.1978), overruled on other grounds by Sharp Bros. Contracting Co. v. American Hoist & Derrick Co., 703 S.W.2d 901 (Mo. 1986). In contrast, tort law is designed to secure the protection of all citizens from the danger of physical harm to their persons or to their property and seeks to enforce standards of conduct. These standards are imposed by society, without regard to any agreement. Tort law has not traditionally protected strictly economic interests related to product qualityin other words, courts have generally refused to create a duty in *1266 tort to prevent such economic losses. See Construction Defects at 894-95, 902.
As set forth above, the economic loss doctrine serves to define the scope of duty and "shield[s] a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus ... keep[s] the risk of liability reasonably calculable." Stern, 98 Nev. at 411, 651 P.2d at 638. Permitting plaintiffs to recover in tort for purely economic losses would result in open-ended liability, since it is virtually impossible to predict all the economic consequences of a given act. See State of La. ex rel. Guste v. M/V Testbank, 752 F.2d 1019, 1022 (5th Cir.1985). Thus, the economic loss doctrine precludes recovery for strictly economic losses in tortregardless whether such damages are sought from an injurious product.
This court has applied the economic loss doctrine outside of the products liability context, see Stern, 98 Nev. at 410-11, 651 P.2d at 638, and has suggested that it could apply with respect to damages to a dwelling. See Oak Grove, 99 Nev. at 625, 668 P.2d at 1080. Additionally, the economic loss doctrine has been specifically applied by other jurisdictions in construction defects cases. See, e.g., Nastri v. Wood Bros. Homes, Inc., 142 Ariz. 439, 690 P.2d 158 (Ct.App.1984) (applying the economic loss doctrine to a negligent construction action against builder); 2314 Lincoln Park West Condo. v. Mann, 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990) (applying the economic loss doctrine to an architectural malpractice action); Atherton Condo. Bd. v. Blume Dev., 115 Wash.2d 506, 799 P.2d 250 (1990) (applying the economic loss doctrine to a negligent construction claim).
We conclude that damages sought, in tort, for economic losses from a defective building are just as offensive to tort law as damages sought for economic losses stemming from a defective product. The Florida Supreme Court has fittingly recognized that the economic loss doctrine must be considered in construction defects cases:
Buying a house is the largest investment many consumers ever make, and homeowners are an appealing, sympathetic class. If a house causes economic disappointment by not meeting a purchaser's expectations, the resulting failure to receive the benefit of the bargain is a core concern of contract, not tort, law. There are protections for homebuyers, however, such as statutory warranties, the general warranty of habitability, and the duty of sellers to disclose defects, as well as the ability of purchasers to inspect houses for defects. Coupled with homebuyers' power to bargain over price, these protections must be viewed as sufficient when compared with the mischief that could be caused by allowing tort recovery for purely economic losses.
Casa Clara v. Charley Toppino and Sons, 620 So.2d 1244, 1247 (Fla.1993) (citations and footnotes omitted). Accordingly, our Pratt and Whitney dictum notwithstanding, we conclude that the economic loss doctrine applies to construction defects cases.[3]

*1267 C. Appellants' negligence claim against the subcontractors

With respect to the construction industry, courts have recognized negligence actions brought by real property owners for personal injury and property damage. See generally Edie Lindsay, Strict Liability and the Building Industry, 33 Emory L.J. 175, 201-02 (1984); see also Woodward v. Chirco Constr. Co., 141 Ariz. 514, 687 P.2d 1269 (1984); Cosmopolitan Homes, Inc., v. Weller, 663 P.2d 1041 (Colo.1983); Theis v. Heuer, 264 Ind. 1, 280 N.E.2d 300 (1972). Under the economic loss doctrine, however, economic losses are not recoverable in negligence absent personal injury or damage to property other than the defective entity itself. See Central Bit Supply, 102 Nev. at 140-41, 717 P.2d at 36-37; Stern, 98 Nev. at 410-11, 651 P.2d at 638; see generally American Law of Products Liability (3d) § 60:52, at 90. Appellants contend that the district court erroneously dismissed their negligence claim against the subcontractors based upon the economic loss doctrine because a defective "product," the framing, caused "other" property damagenamely, water intrusion, damage to flooring and ceilings, and structural and wood decaythereby rendering the economic loss doctrine inapplicable.
We disagree. In Pratt and Whitney, 107 Nev. at 539, 815 P.2d at 603, we determined that an airplane engine that failed and caused the plane to crash damaged only the product (airplane) itself, and therefore, the economic loss doctrine barred recovery in tort. In concluding that a component part of the airplane injured the integrated product and caused only economic losses, our Pratt and Whitney decision relied on East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). There, the U.S. Supreme Court determined that component parts of a product cannot cause "other property damage" compensable in tort:
[I]n the traditional "property damage" cases, the defective product damages other property.... "Since all but the simplest machines have component parts, [a contrary] holding would require a finding of `property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability." Northern Power & Engineering Corp. v. Caterpillar Tractor Co., 623 P.2d 324, 330 (Alaska 1981).... Obviously, damage to a product itself has certain attributes of a products-liability claim. But the injury sufferedthe failure of the product to function properlyis the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain.
Id. at 867-68, 106 S.Ct. 2295, quoted, in part, with approval in Pratt and Whitney, 107 Nev. at 540, 815 P.2d at 604. Thus, we have unequivocally concluded, with respect to factory-assembled products, that when an integral component injures the rest of the product, only economic loss has occurred.
Determining whether part of a structure has caused economic loss or property damage is analytically more difficult than with factory-assembled products. As discussed below, buildings generally represent the cooperative work of a variety of parties at different times, and each building may involve unique materials and methods, as well as an original design. Additionally, buildings, because of their long life span, are subject to remodeling and other changes, which may involve additional designs, laborers and materials.
In Oak Grove, 99 Nev. at 625, 668 P.2d at 1080-81, we suggested, in dictum, that the owner of an apartment complex, who sued the manufacturer of fittings used in the complex's plumbing and heating system, had stated causes of action in negligence and strict liability. The fittings had allegedly increased water velocity beyond safe limits and caused extensive erosion, corrosion and leakage throughout the complex. Id. at 619, 668 P.2d at 1077. Our dictum stated that the owners were not seeking to recover purely economic losses. Id. at 625, 668 P.2d at 1080.
In our subsequent Pratt and Whitney opinion, we distinguished Oak Grove as follows:

*1268 In Oak Grove, ... there was little factual basis for invoking the economic loss doctrine. Indeed, rather than receding from our rulings in Stern and Central Bit Supply, we concluded, by way of dictum, that the factual scenario in Oak Grove did not implicate the economic loss doctrine because it involved a defective heating and plumbing system that caused water leakage and damage throughout the apartment complex. It was thus clear that, in contrast to the instant case, Oak Grove did not involve a single integrated product that "injured itself." The apartment complex there consisted of a number of separate apartment units that were each self-contained and constructed for the separate occupancy of the end users.
Pratt and Whitney, 107 Nev. at 538-39, 815 P.2d at 603.
Oak Grove did involve an entire apartment complex with separate apartment units; nevertheless, these units were part of the larger structure, and the heating and plumbing system served the entire complex. Although buildings may involve a more complicated system of "components," we do not discern a meaningful analytical difference between an airplane's engine and a building's heating and plumbing system. Both an airplane's engine and a building's heating and plumbing system are necessary and integrated parts of the greater whole; additionally, both are themselves comprised of smaller components. Consequently, when a heating and plumbing system damages the building as a whole, the building has injured itself and only economic losses have occurred. We therefore disapprove of our dictum in Oak Grove, which stated that the leaky fittings had not caused purely economic losses.
Other jurisdictions have concluded that a defective building creates only economic loss, even if the particular defect causes damage to other parts of the structure. See, e.g., Chicago Heights Venture v. Dynamit Nobel of America, 782 F.2d 723 (7th Cir.1986) (holding roof material that failed during windstorm, resulting in leaks, was not legally significant, and only economic losses were at issue); Nastri v. Wood Bros. Homes, Inc., 142 Ariz. 439, 690 P.2d 158 (Ct.App.1984) (holding cracks in kitchen floor, vinyl flooring, family room and bedroom, and buckling of the roof, cracked bricks and joists, all involved damage to the structure itself; therefore, only economic losses were presented and owners could not sue in tort); Danforth v. Acorn Structures, Inc., 608 A.2d 1194 (Del.1992) (holding homeowner who brought tort action against seller of building kit for negligent design could not recover because deterioration of windows, door frames and exterior siding was strictly economic loss); Casa Clara v. Charley Toppino and Sons, 620 So.2d 1244 (Fla.1993) (holding homeowners could not recover in tort for allegedly defective concrete that cracked and broke off); Redarowicz v. Ohlendorf, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982) (holding owner of home who sought recovery for costs of repair and replacement for defectively constructed chimney, wall and patio suffered only economic losses not recoverable in tort because homeowner alleged only qualitative defects; inferior workmanship that leads to eventual deterioration is not properly addressed by tort law); Chenango C. Indus. D.A. v. Lockwood Greene E., 114 A.D.2d 728, 494 N.Y.S.2d 832 (1985) (holding building owners could not sue roofing material manufacturer in tort for cracks, splits and leaks in the roof because owners suffered only economic losses); American Towers Owners v. CCI Mechanical, 930 P.2d 1182 (Utah 1996) (holding condominium association could not pursue negligence claim against contractor and subcontractors for economic losses, which included repair costs and diminution of property values, plumbing problems, including pipe breaks and leaks and pressure loss and failures, as well as substandard components).[4]
*1269 Here, the townhouses are part of larger, integrated structures, and the framing was an integral component of these structures. The damage caused by the allegedly defective framing therefore constituted damage to the structures themselvesno "other" property damage resulted, and appellants suffered purely economic losses. Because of the alleged construction defects appellants failed to receive the benefit of their bargains; the defects resulted in a lower standard of quality than that expected. Such inferior workmanship, which leads to building deterioration, is not properly addressed by tort law. See Redarowicz, 65 Ill.Dec. 411, 441 N.E.2d at 327. In such circumstances, the overriding policy of tort law, to promote safety, is not implicated. We therefore discern no reason to impose, in tort law, a general societal duty to prevent such economic losses.
Appellants further attempt to overcome the economic loss doctrine limitation on tort actions by asserting that this court should apply the foreseeability exception to the economic loss rule. According to appellants, the "[d]amage from defective construction and the repair costs to correct the defects are foreseeable and determinable with relative certainty." Previously, in Stern, we were urged to adopt a foreseeability exception to the economic loss doctrine; we concluded, however, that "[t]he foreseeability of economic loss, even when modified by other factors, is a standard that sweeps too broadly in a professional or commercial context, portending liability that is socially harmful in its potential scope and uncertainty." Stern, 98 Nev. at 411, 651 P.2d at 638.
Subsequently, in Charlie Brown Construction Co. v. Boulder City, 106 Nev. 497, 797 P.2d 946 (1990), we considered a situation in which the subcontractors on a subdivision project approved by the City brought an action against the City to recover for unpaid work following the subdivider's default. One of the claims for relief was that the City negligently released funds deposited by the subdivider and failed to require the subdivider to post a payment bond as mandated by City ordinance. On appeal, the city argued that appellants suffered only economic losses, and therefore, the negligence claim was barred by the economic loss doctrine. We disagreed and stated that
[t]his case is readily distinguishable from the economic loss cases we have decided....
....
Both Stern and Central Bit are cases where individuals and entities who suffered damage to their economic expectancies because of allegedly defective products sought recovery from the parties participating in the supplying of the product. As we explained in Central Bit, this rule is really the seller foreseeability rule for consequential damages first enunciated in Hadley v. Baxendale, 156 Eng.Rep. 145 (1854). [Here, appellants'] injuries were not caused by a faulty product. They are not third parties to an injury or tort seeking recovery for derivative harm. [Appellants] are directly injured parties seeking direct recovery from the tortfeasor. It is not consequential damages they seek but direct damages from the failure to perform a mandatory act....
Additionally, although appellants did not suffer property injury in the more traditional tort sense in which we generally view the matter, it is not at all clear that they did not suffer an injury to property. They certainly suffered injury to their respective property interests in the amount of their unpaid claims when they performed labor and added materials to the City's land.
Also, given the context of the dispute, it would be disingenuous for the City to claim that appellants' injuries were unforeseeable.... As the purely economic recovery rule is bound up in foreseeability, the rule enunciated in Stern and Central Bit is simply inapplicable to this case.
Charlie Brown, 106 Nev. at 507-09, 797 P.2d at 952-53 (footnote omitted).
Unfortunately, Charlie Brown failed to recognize that the damages at issue were strictly economic losses, not cognizable in tort. No physical injury to persons or property existed. Moreover, the policy rationale supporting the imposition of damages for negligence in tort was not triggeredthis court's conclusion that the subcontractors *1270 had stated a cause of action in tort did not promote the goal of safety. Further, although Charlie Brown suggests that the economic loss doctrine's application turns on foreseeability, this notion was expressly disapproved in Stern. We now reiterate that foreseeability of damages plays no role with respect to the economic loss doctrine. Purely economic losses fall outside the purview of tort recovery, even if such losses are foreseeable. As discussed above, the doctrine's application turns on the type of damages at issue, and the policies underlying recovery in tort and contract. Accordingly, we overrule Charlie Brown with respect to its analysis and application of the economic loss doctrine, and we reject appellants' argument that the foreseeability exception to the economic loss doctrine should be adopted.
Based upon the foregoing discussion, we conclude that the district court properly applied the economic loss doctrine to preclude appellants' negligence claim against the subcontractors.

D. Appellants' negligence claim against the City

In their complaint for negligence against the City, appellants assert that the City approved the construction of the townhouses with full knowledge of the defects alleged, and failed to act reasonably after learning of the alleged defects by not requiring the contractor to comply with the applicable building codes. The district court precluded appellants' negligence claim against the City under the economic loss doctrine. Specifically, the district court found that appellants' claims against the City were all based on negligence, and that appellants did not allege any personal injury or property damage, but instead sought to recover damages for costs of repair and/or replacement to the townhouses. As explained previously, under the economic loss doctrine there can be no recovery in tort for purely economic loss. Additionally, although a cause of action for an intentional tort is not precluded under the economic loss doctrine, see Stern, 98 Nev. at 411, 651 P.2d at 638; Construction Defects at 892 n. 2, appellants did not plead facts to support an intentional tort. See Tahoe Village Homeowners v. Douglas County, 106 Nev. 660, 799 P.2d 556 (1990). Accordingly, we conclude that the district court properly dismissed appellants' claim against the City.

E. Appellants' strict liability claims against the subcontractors and the City

The district court concluded that appellants could not pursue their strict liability claims against the subcontractors and the City because a house is not a "product" for strict liability purposes and because such claims are precluded by the economic loss doctrine. Appellants contend that they had no meaningful opportunity to discover the framing deficiencies and that they were required to rely on the framers' "superior and exclusive" knowledge.
We explained in Stern, 98 Nev. at 411, 651 P.2d at 638, that "[t]he doctrine of strict products liability was developed to assist plaintiffs who could not prove that products which caused physical injury at the point of use had been manufactured negligently. The doctrine is unavailable for purely economic loss; its application is limited to personal injury and property damage." See also May, 113 Nev. at 1299 n. 1, 948 P.2d at 266 n. 1; Central Bit Supply, 102 Nev. at 140-41, 717 P.2d at 36. As discussed above, appellants seek to recover purely economic loss with respect to the defective townhouses. Consequently, the district court properly dismissed their strict liability claims.
Moreover, we agree with the district court's conclusion, in this instance, that the townhouses are not "products" for purposes of strict products liability. The Restatement of Torts (Second) section 402A defines strict liability as follows:
(1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and

*1271 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product or entered into any contractual relation with the seller.
The doctrine of strict products liability developed from judicial concerns about a plaintiff's ability to prove a remote manufacturer's or seller's negligence, to spread the costs of damage from dangerously defective products to the consumer by imposing them on the manufacturer or seller, and to promote safety by eliminating the negligence requirement. See generally Prosser and Keeton § 98, at 692-93.
Some courts have concluded that a building can constitute a "product" under strict products liability. See, e.g., Blagg v. Fred Hunt Co., 272 Ark. 185, 612 S.W.2d 321 (1981) (stating that "product" applies to a house just as it applies to an automobile; obligation of seller or manufacturer is one of enterprise liability); Miller v. Los Angeles County Flood Control District, 8 Cal.3d 689, 106 Cal.Rptr. 1, 505 P.2d 193 (1973) (ruling that the doctrine of strict products liability applied to homes, since they can be defective products); see generally Annotation, Recovery, Under Strict Liability in Tort, for Injury or Damage Caused by Defects in Building or Land, 25 A.L.R.4th 351, 365-66 (1983) [hereinafter Defects in Building ].
Other courts however, have concluded that strict products liability does not apply to buildings. In reaching their conclusions, these courts have distinguished the policies underlying strict products liability from those involved in the situation where a house or building is defective. More specifically, these courts have recognized that in the construction context, tracing a defect to a manufacturer or supplier and locating that entity generally poses no significant problem, unlike the situation with the remote manufacturer of a product that travels through interstate commerce. Additionally, these courts have pointed out that a builder cannot easily limit his liability by express warranties in disclaimers and that the purchaser of a building has the opportunity to make a meaningful inspection of the property at issue. See Defects in Building at 366-67, and cases cited therein.
Other commentators have provided additional reasons why construction products should not be subject to strict liability:
The uncritical application of the strict tort liability doctrine ... disregards some very real differences between mass-produced goods and buildings and their respective methods of production. The raising of a building and the assembly-line manufacturing of a product are not analogous processes. From start to finish, the construction of a building depends on the cooperative interaction of a number of independent parties.
....
Most buildings are one-of-a-kind, requiring methods and materials that change with each project. The architect cannot work out design weaknesses in a series of prototypes, which are built but never put on the market, as is often done with manufactured goods. Neither can the contractor test a variety of method and material combinations before putting up the final structure. Even identical model subdivision homes are subject to the vagaries of subsurface soil conditions.... Furthermore, in construction work the project is generally designed by one independent firm and built by another. The consistent interplay between designer and builder, usually present in the manufacturing industry, is absent in the construction industry....
Another major distinction between manufactured goods and buildings is that normally a building is put up at the direction of the owner/developer, and if his needs change, the final product may be quite different from that shown in the original plans....
A final difference between buildings and manufactured goods [is that] [b]uildings have significantly longer expected useful *1272 life than do other products, which warrants different standards of maintenance and repair.
Edie Lindsay, Strict Liability and the Building Industry, 33 Emory L.J. 175, 184-91 (1984).
In Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971), we considered whether a contractor who had performed remodeling work on a home could be subject to strict liability in tort. The contractor had installed a gas line to a new water heater, and the gas line had a leaky fitting. The leak caused a fire that damaged the house and its contents. After the district court dismissed the homeowners' strict liability and warranty claims, the homeowners appealed. On appeal, this court noted that strict liability had been applied to buildings:
As in the application of the doctrine to cases where injury was caused by foodstuffs, automobiles, medicine and others, strict liability has been applied to homes or builders. The nature of the product is such that superior and exclusive knowledge in the builder or fabricator is called for and he therefore must bear the responsibility of its quality within reasonable limits.
Id. at 207, 484 P.2d at 575.
We then explained that the allegedly defective product was that part of the gas system added onto the original system by the contractor. We concluded that a "leaky fitting comes within the definition of a defective product" and "that [the contractor] must be said to have manufactured and sold a `product' so as to bring into operation the doctrine of strict liability." Id. at 208, 484 P.2d at 576.
The contractor who installed the gas line fitting in Worrell should not have been subject to the doctrine of strict products liability. As set forth above, one is strictly liable for damages from a dangerously defective product only if one is a seller "engaged in the business of selling such a product." See Restatement (Second) of Torts § 402A (1965). Although a contractor may, as part of a construction or remodeling project, install certain products, a contractor, without doing more, is not engaged in the business of "manufacturing" or selling such products and therefore does not come within the ambit of section 402A. Consequently, we overrule Worrell with respect to its application of strict products liability.[5]
For the reasons set forth above, we conclude that the district court properly determined that appellants' strict liability claims were not viable.[6]

III. The City's cross-appeal

The City filed a cross-appeal contending that the district court erred in dismissing its cross-claims against the developer and contractor for indemnity and contribution. We conclude that we lack jurisdiction to consider the City's cross-appeal. Only an aggrieved party has standing to appeal. See NRAP 3A(a); Valley Bank of Nevada v. Ginsburg, 110 Nev. 440, 446, 874 P.2d 729, 734 (1994). The district court granted the City's motion for summary judgment and dismissed all of appellants' claims against the City. Because the City prevailed in the district court, the City is not an aggrieved party. We therefore dismiss the City's cross-appeal for lack of jurisdiction.[7]

*1273 CONCLUSION
Based upon the discussion above, we affirm the district court's orders dismissing appellants' negligence and strict liability claims against the subcontractors and the City because the claims are barred by the economic loss doctrine and because the town-houses are not "products" for purposes of strict products liability. Additionally, we conclude that we lack jurisdiction to consider the City's cross-appeal.
SHEARING, and AGOSTI, JJ., concur.
MAUPIN, J., concurring in part and dissenting in part.
The internal inconsistency that marks our jurisprudence on the economic loss doctrine is not unique to Nevada. Almost every state that has adopted the economic loss rule has carved out discreet exceptions that to some degree undermine the public policies behind it. The majority on rehearing in this matter, I believe, substantially reconciles our prior authority on this subject and, in large part, provides a reasonable synthesis that will facilitate predictability in the future. I write separately to expand on the history behind the economic loss doctrine in Nevada and because I believe the majority may have unnecessarily broadened its scope.
The starting point of any analysis of our version of the rule must be Local Joint Executive Board v. Stern, 98 Nev. 409, 651 P.2d 637 (1982). In that case, former employees of the MGM Grand Hotel sought to recover lost salaries and employment benefits for the period during which the resort remained closed following a catastrophic fire in November 1980. This court reaffirmed the common law rule that, "absent privity of contract or personal injury or property damage," a plaintiff may not recover in negligence or strict tort liability for purely economic losses. Id. at 411, 651 P.2d at 638. We consistently applied Stern to prevent tort recovery for purely economic losses in Central Bit Supply v. Waldrop Drilling, 102 Nev. 139, 717 P.2d 35 (1986) (holding that economic losses in connection with a broken drill bit could only be recovered under a breach of warranty theory), and in Arco Products Co. v. May, 113 Nev. 1295, 948 P.2d 263 (1997) (ruling that loss of sales by a convenience store from allegedly defective inventory control system could not, as a matter of law, be the subject of a negligence or strict tort liability claim).[1]
As noted, a general statement of the "economic loss" rule is that recovery for purely economic losses may not be had in tort. Our decisions in Stern, Central Bit and Arco demonstrate this court's clear and continuing embrace of the economic loss doctrine. There are several corollaries to the economic loss rule. First, claims for personal injuries and/or property damage do not implicate the economic loss rule. Second, economic losses are recoverable in tort only when they are incidental to claims for personal injuries and/or property damage. Third, when a product causes injury to itself, i.e., where a defective component of an integrated product damages all or part of the remaining whole, the damages are purely economic, leaving the parties to the acquisition of the product to their contractual remedies. Fourth, a product that injures "other property" causes property damage recoverable in tort. See American Law of Products Liability (3d) § 60:36, at 66. We have directly or impliedly adopted these correlative principles in all of our cases dealing with this subject.[2]
The primary policy behind the rule articulated in Stern is to:
shield a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial *1274 or professional setting,[3] and thus to keep the risk of liability reasonably calculable.
Stern, 98 Nev. at 411, 651 P.2d at 638 (emphasis and footnote added).
The majority in this matter has most ably articulated the history behind the rule and the divergence in scope between tort and contract based recovery.[4] As also noted by the majority, the fundamental policy behind this rule is to restrict parties to commercial transactions to contractual remedies based simply upon the foreseeability of loss of financial expectancies. Unfortunately, beyond Stern, Central Bit and Arco, several of our other cases have obscured the scope of the economic loss rule.

OAK GROVE INVESTORS v. BELL & GOSSETT CO.

In Oak Grove Investors v. Bell & Gossett Co., 99 Nev. 616, 668 P.2d 1075 (1983), a case decided only one year after Stern, this court discussed the economic loss doctrine in the context of a "construction-defect" dispute. A unanimous court concluded that a negligence and strict tort liability claim arising from a defective plumbing fitting should not have been dismissed on statute of limitation grounds, or because of a failure of proof as to whether a defect with regard to the fitting had been shown. Although not necessary to the decision, this court went on to observe via obiter dictum that water leakage caused "substantial leakage of water throughout, and damage to, the apartment [sic] within the ... complex." Oak Grove, 99 Nev. at 625, 668 P.2d at 1080. From this factual pattern, this court concluded that the water damage claim in Oak Grove constituted "property damage" for purposes of an "economic loss" analysis.[5] Thus, a completed entity that "injured itself" caused "property damage," taking the case out of the economic loss doctrine.[6]

NATIONAL UNION FIRE INSURANCE v. PRATT AND WHITNEY
An attempted extension of the policy behind the economic loss doctrine is reflected by our split decision in National Union Fire Insurance v. Pratt and Whitney, 107 Nev. 535, 815 P.2d 601 (1991). In that case, this court embraced the well-accepted rule, noted above, that a plaintiff may not recover in tort for the loss of a product that injures itself. In Pratt and Whitney, this court considered an entire airplane a "product" for the purpose of the economic loss rule. Thus, this court rejected the notion that a readily identifiable component part of the aircraft, namely the engine, was the cause of "property" damage, to wit: the destruction of the entire aircraft. This approach is consistent with that taken by the United States Supreme Court in East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (a steamship injuring itself causes pure economic loss). However, in its analysis of this issue, the Pratt and Whitney opinion contains several problematic justifications of its result that have serious implications with respect to the scope of the rule in the context of construction defect litigation.
*1275 First, the majority attempted to distinguish Oak Grove with the following observation:
In Oak Grove, however, there was little factual basis for invoking the economic loss doctrine. Indeed, rather than receding from our rulings in Stern and Central Bit Supply,[7] we concluded, by way of dictum, that the factual scenario in Oak Grove did not implicate the economic loss doctrine because it involved a defective heating and plumbing system that caused water leakage and damage throughout the apartment complex. It was thus clear that, in contrast to the instant case, Oak Grove did not involve a single integrated product that "injured itself." The apartment complex there consisted of a number of separate apartment units that were each self-contained and constructed for the separate occupancy of the end users. Indeed, this court has not yet entered the fray among courts as to whether even a "house" constitutes a product for purposes of the law of strict products liability, let alone an entire apartment complex.
Pratt and Whitney, 107 Nev. at 538-39, 815 P.2d at 603 (footnote added).
The primary distinction drawn by the majority between Pratt and Whitney and Oak Grove involved the fact that a component part of one apartment unit damaged other units in the complex rather than a component part of a single integrated entity (or apartment unit) causing injury to itself. This seemingly ignores the fact that Oak Grove does not, in its dictum on the subject, draw any distinction between damages to the individual units in which the fittings were installed and damages caused by any one fitting to any or all of the other units. Further, in Oak Grove, the offending fittings had been installed in all of the separate apartment units. Thus, we cannot determine from the facts of Oak Grove whether the water damage resulting from any one fitting caused damage to "other property," to wit: the other units.
Secondly, the Pratt and Whitney majority observes that the economic loss doctrine was never intended to apply to construction projects that "reflect the products and efforts of so many different manufacturers, laborers, crafts, supervisors and inspectors in the creation of an essentially permanent place of habitation." Pratt and Whitney, 107 Nev. at 539, 815 P.2d at 603. Of course, this comment applies with equal force to the manufacture of an airplanea much more complex entity than many commercial or residential buildings.
Third, the Pratt and Whitney majority notes that commercial products that injure themselves are readily insurable, and thus, suitable for inclusion in the economic loss doctrine. This distinction is questionable because residential and commercial structures are also readily covered by first-party casualty insurance.
Thus, the distinctions attempted did not demonstrate a sufficient doctrinal reason as a matter of public policy to justify variant treatment for these purposes between apartment, commercial or home construction on one hand, and complex conveyances such as automobiles, steamships or airplanes on the other. Again, airplanes as well as apartment complexes or houses are self-contained entities that are the end result of an integration of hundreds, if not thousands of component parts. Thus, in my view, Pratt and Whitney cannot be reconciled with this court's decision in Oak Grove.
Notwithstanding the statements made in Pratt and Whitney, and as noted by the majority in this case, there are numerous cases from other jurisdictions in which the economic loss doctrine is applied to construction defect cases. Given the parallel policies that could apply to both construction and products defects cases, Pratt and Whitney should have rejected the dictum in Oak Grove as no longer valid. I therefore agree that the economic loss doctrine is generally implicated when a product or an integrated piece of construction injures itself.[8] This, of *1276 course, is the position taken by the U.S. Supreme Court in East River.[9] Thus, Stern, Central Bit, Arco and Pratt and Whitney (excepting its attempt to distinguish Oak Grove ) all represent a sound and consistent application of the economic loss doctrine.[10]
However, in the situation alluded to by the majority in Pratt and Whitney, where a defect in one unit of a multiple occupancy structure causes property damage throughout the building, I would leave the issue of whether "other property" has been damaged to a case-by-case factual analysis. Such factual issues should turn on whether each unit is self-contained. Thus, to the extent that the same alternate scenario exists in this case, I would partially dissent from the majority.
Going further, when an identifiable component part added to the original "product" or an original piece of construction injures or damages all or part of the remainder, the added component is "other property" that may be defective from a negligence or strict liability standpoint. Thus, the added component injures "other property" for tort recovery purposes. See Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971), Saratoga and the fourth corollary discussed above.[11] Again, this notion would seem to apply equally well to products and construction litigation.

WORRELL v. BARNES
According to the majority, Worrell v. Barnes wrongly held that contractors were not in the business of "manufacturing" or selling products "within the ambit of section 402A" of the Restatement (Second) of Torts.
The property damage in Worrell resulted from a residential fire allegedly caused by a portion of a heating system installed by the defendant during a remodeling project. This court concluded that the contractor "manufactured and sold a `product,'" which included a defective gas fitting and the portion of the gas water heating system installed during the remodeling project. Worrell, 87 Nev. at 208, 484 P.2d at 576. While the contractor did not actually manufacture the fitting, he was deemed in Worrell to have manufactured a product, to wit: the fitting and, at least impliedly, the newly installed portion of the plumbing system. Interestingly, the Worrell court implied that the doctrine of strict tort liability would apply to any kind of defect in construction, regardless of whether the defect was part of the original construction, or added subsequent to completion:
The ordinary purchaser is not more capable of detecting a defect in a chimney flue or vent of a heating apparatus (Schipper [v. Levitt & Sons, Inc.], supra [44 N.J. 70, 207 A.2d 314 (1965)]) or faulty plumbing covered by a concrete slab foundation (Humber [v. Morton], supra [426 S.W.2d 554 (Tex.1968)]), in a house erected by a builder of two than in one constructed by a quantity builder of 200. Avner v. Longridge Estates, [272 Cal.App.2d 607] 77 Cal.Rptr. 633 (Cal.App.1969); 1969-70 Annual Survey of American Law, p. 474; 13 A.L.R.3d 1057, 1097 (1967). When a plaintiff proves that while he was using an instrumentality in a way it was intended to be used he was injured as a result of a defective design and/or manufacture which made the instrumentality unsafe for its *1277 intended use, and that he was unaware of the defect his burden has been accomplished. Restatement of Torts 2d, Comment G, § 402A. An owner relies upon the skill of the fabricator of a piping system, and he has a right to expect freedom from injury on the basis of the fabricator's superior knowledge.[12]
Worrell, 87 Nev. at 207, 484 P.2d at 575-76 (footnote added).
The Worrell court did not reach the issue of whether the economic loss rule was implicated in a construction defects suit where the finished or remodeled construction damaged itself. However, for future reference, an analysis of the economic loss doctrine under the facts of Worrell is instructive.
To compare, the primary damages deemed recoverable in tort via negligence or strict liability in Oak Grove were arguably economic losses. Thus, notwithstanding the language quoted immediately above, had the gas fitting in Worrell been part of the original construction, the damages would have been restricted to economic losses. However, the losses actually sustained as described in Worrell were not pure economic losses under East River, Pratt and Whitney and Saratoga because an outside component was incorporated into the original construction, which caused damage to "other property." Therefore, in my view, had we reached the issue of whether pure economic losses had been sustained in Worrell, the outcome would have remained unchanged. I also believe that the component parts or subsystems of a house or other building implicate strict liability and negligence issues when personal injuries from construction defects have been sustained or where the defective building component damages "other property," such as a free standing neighboring dwelling.
I concede that the fact pattern in Worrell does not fit neatly within the Restatement Second formulation. However, I would leave Worrell intact and interpret it as invoking a salutory and beneficial public policy allowing recovery when a defect in an addition to a structure causes property damage to the remaining whole, or causes personal injuries, or causes property damage to other structures or self-contained but attached units.

CONCLUSION
While I agree that the economic loss rule is implicated in construction defect litigation, I believe that application of the rule should be limited as suggested above.[13]
ROSE, C.J., dissenting.
I dissent to the application of the economic loss doctrine to construction defect cases. While our prior decisions in this area of the law are neither consistent nor uniformly well reasoned, they do show a clear reluctance to apply the economic loss doctrine to construction defect cases and, in dicta, expressly state just that.
This court first expressed its reluctance to extend the economic loss doctrine to construction defect cases in Oak Grove Investors v. Bell & Gossett Co., 99 Nev. 616, 617, 668 P.2d 1075, 1077 (1983). In Oak Grove, a defective plumbing and heating system caused water leakage and damage throughout an apartment complex. The district court granted summary judgment, concluding that there was no material issue of fact concerning whether the plumbing fitting *1278 manufactured by Bell & Gossett was defective and whether the statute of limitations precluded recovery. Id. at 620, 668 P.2d at 1077. We reversed the district court order granting summary judgment, concluding that there were triable issues of material fact as to whether the manufacturer's failure to warn may have rendered the product defective, and whether the statute of limitations had run. Id. at 625, 668 P.2d at 1081.
Although in Oak Grove the district court did not rule on the applicability of the economic loss doctrine, in dicta we refused to extend the economic loss doctrine by stating:
the defective plumbing and heating system caused "substantial leakage of water throughout, and damage to, the apartment [sic] within the ... complex." The amount of property damage sustained is a question for the finder of fact. Appellant is not seeking to recover purely economic losses, and therefore has stated causes of action in negligence and strict liability.
99 Nev. at 625, 668 P.2d at 1080-81 (citations omitted). While not expansive in its reasoning, the Oak Grove court clearly refused to apply the economic loss doctrine to a construction defect case.
Many years later, in Charlie Brown Construction Co. v. Boulder City, 106 Nev. 497, 797 P.2d 946 (1990), we again rejected the applicability of the economic loss doctrine to construction defect cases, and thereby permitted recovery of tort damages. Although we rejected the economic loss doctrine on the basis that the damages sustained were foreseeable, we expressed a clear intent to permit tort damages in a construction defect case:
Brown and Delta are directly injured parties seeking direct recovery from the tortfeasor. It is not consequential damages they seek but direct damages from the failure to perform a mandatory act. Our citation in [Local Joint Exec. Bd. v. Stern, 98 Nev. 409, 651 P.2d 637 (1982) ] to The Restatement (Second) of Torts § 766 (1979) ... makes it clear that the prohibition does not extend to this circumstance [where city failed to require payment bond that would have secured payment to two subcontractors after general contractor became insolvent].
Id. at 508, 797 P.2d at 953.
Further evidence of this court's long-standing reluctance to extend the economic loss doctrine to construction defect cases is found in National Union Fire Insurance v. Pratt and Whitney, 107 Nev. 535, 540, 815 P.2d 601, 604 (1991). In Pratt and Whitney, an entire aircraft was destroyed because of a defective engine. Id. at 540, 815 P.2d at 604. While the majority concluded that the economic loss doctrine applied and precluded recovery on tort theories, it carefully explained that it was not overruling the Oak Grove decision and that the economic loss doctrine should not preclude recovery on tort theories in construction defect cases. Id. at 538-39, 815 P.2d at 603. The majority in Pratt and Whitney distinguished construction defect cases, where the economic loss doctrine was not applicable, from those cases involving a "single integrated product that `injured itself'":
The apartment complex [in Oak Grove ] consisted of a number of separate apartment units that were each self-contained and constructed for the separate occupancy of the end users. Indeed, this court has not yet entered the fray among courts as to whether even a "house" constitutes a product for purposes of the law of strict products liability, let alone an entire apartment complex. We deem it safe to conclude, however, that the economic loss doctrine was never intended to apply to construction projects that reflect the products and efforts of so many different manufacturers, laborers, crafts, supervisors and inspectors in the creation of an essentially permanent place of habitation.

Id. at 539, 815 P.2d at 603 (citation omitted) (emphasis added).
I appreciate the attempt to establish a clear line of demarcation between contract and to damages in the majority opinion, even though it is difficult in construction defect cases. My concern in doing this is that there will be times where unusual factual situations will fall between the clearly defined recovery theories of contract and tort and leave a homeowner of a defectively constructed *1279 home without a remedy. Under the majority's opinion and the present state of the law, a subsequent purchaser of a condominium with a latent defect created by a subcontractor and found five years after construction will fall in that category if the contractor has gone bankrupt or out of business. This would occur because tort law would be inapplicable because of the economic loss doctrine and contract damages would provide no viable vehicle for recovery because the homeowner is not in privity with the subcontractor, the contractor is defunct and the construction bond long since exonerated. The owner of the defective condominium would have no viable remedy against the subcontractor even though he may be in business and making millions of dollars.
To avoid situations like this from occurring, I see no problem with letting contract and tort theories of recovery apply to construction defect cases as has been done by several states. See Cosmopolitan Homes, Inc. v. Weller, 663 P.2d 1041 (Colo.1983); Kristek v. Catron, 7 Kan.App.2d 495, 644 P.2d 480 (1982); Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670 (Miss.1983); Juliano v. Gaston, 187 N.J.Super. 491, 455 A.2d 523 (Ct.App.Div.1982); McMillan v. Brune-Harpenau-Torbeck Builders, Inc., 8 Ohio St.3d 3, 455 N.E.2d 1276 (1983); Blake v. Doe, 89 Ohio App.3d 130, 623 N.E.2d 1229 (1993); Moxley v. Laramie Builders, Inc., 600 P.2d 733 (Wyo.1979). While legal theories of recovery may overlap somewhat in any given construction defect case, I see no practical harm in this. Before recovery can be made, proof that the contractor, subcontractor or supplier was negligent must be established and no plaintiff is entitled to more than one recovery no matter how many theories of recovery may be applicable. See Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017 (9th Cir.1999); Bradford v. Vento, 997 S.W.2d 713 (Tex.App.1999). My clear preference is to provide a remedy, be it tort or contract, in all construction defect cases whether the loss is considered the result of a breach of contract or negligent conduct. This can be done simply by refusing to apply the economic loss doctrine to construction defect cases.
Moreover, in its sweeping application of the economic loss doctrine, the majority narrows the long-standing exception to NRS 41.033, Nevada's governmental immunity statute, that this court created in Butler v. Bogdanovich, 101 Nev. 449, 705 P.2d 662 (1985), and reaffirmed in Lotter v. Clark County Board of Commissioners, 106 Nev. 366, 793 P.2d 1320 (1990) and Tahoe Village Homeowners Association v. Douglas County, 106 Nev. 660, 799 P.2d 556 (1990). In the aforementioned cases, we declared that governmental immunity will not bar a tort action against the government if it failed to act reasonably after learning of a hazard. Butler, 101 Nev. at 451, 705 P.2d at 663; Lotter, 106 Nev. at 369, 793 P.2d at 1322; Tahoe Village, 106 Nev. at 662, 799 P.2d at 557-58. In this prior precedent, governmental conduct deemed unreasonable included an inspector's approval of a contractor's work with knowledge of its defective condition. See id. Without explicitly overruling Butler, Lotter, or Tahoe Village, the majority eliminates the very loss sought in these type of cases, property damage. Effectively, this line of authority is eliminated by today's opinion.
The economic loss doctrine is a judicial creationit is not a statute that we are compelled to follow. It is a principle of law we can adopt or reject depending on what better serves Nevadans. With so much hasty construction taking place in Nevada today, I think the better path would be to arm our home purchasers with all available remedies, when faced with a defectively constructed home, rather than the one taken by the majority today. I respectfully dissent.
NOTES
[1] This matter was submitted for decision prior to expansion of the court from five to seven justices on January 4, 1999. See Dow Chemical Co. v. Mahlum, 115 Nev. 13, 973 P.2d 842 (1999). Justice Maupin is successor in office to former Chief Justice Steffen, and Justice Agosti is successor in office to former Chief Justice Springer.
[2] As pointed out by one commentator, "[j]udicial hostility to the use of tort theory to recover purely economic losses predates the twentieth-century battle over product liability. This hostility was motivated primarily by the fear of mass litigation and the concern that traditional tort concepts were not capable of providing clear limitations on potentially limitless liability." Construction Defects at 898.
[3] We note that our dissenting colleague would create an absolute exception to the economic loss doctrine for construction defects cases, at least in the residential context. However, any attempt to exempt a certain type of case from the doctrine's application, without analyzing the policy rationales underlying the doctrine, and without considering the very real distinctions between the policies governing recovery in contract and tort, necessarily shifts the focus to a particular plaintiff or group of plaintiffs. Such an approach undermines the very purpose of the economic loss doctrineto provide a boundary between contract law and tort lawand results in outcome-determinative decisions that may have no analytical consistency. Such decision making will inevitably blur and potentially destroy the distinctions between these two fundamentally different civil remedies.

In our view, the more reasoned method of analyzing the economic loss doctrine is to examine the relevant policies in order to ascertain the proper boundary between the distinct civil law duties that exist separately in contract and tort. In the case at bar, permitting tort recovery for economic losses from construction defects would create a general, societally imposed duty on the part of builders and developers to avoid such losses. These losses are not properly addressed by tort law, which has as its underlying policy the promotion of safety. Instead, such harm is paradigmatically addressed by the policies underlying contract lawto enforce standards of quality as defined by the parties' contractual relationships.
[4] We are aware that other courts have concluded that a defective part of a building can cause damage to "other property" cognizable in tort. See, e.g., Lamb v. Georgia Pacific Corp., 194 Ga. App. 848, 392 S.E.2d 307 (1990); Kristek v. Catron, 7 Kan.App.2d 495, 644 P.2d 480 (1982); Board of Education v. A, C, and S, Inc., 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989); Northridge Co. v. W.R. Grace and Co., 162 Wis.2d 918, 471 N.W.2d 179 (1991). We do not find these cases analytically persuasive, however.
[5] We acknowledge that certain products may be installed in a building and may retain their separate identities as products, without becoming an integrated part of the structure. In such instances, the doctrine of strict products liability could apply to the manufacturers of these distinct products, if dangerously defective. Nevertheless, at this point, we need not decide as a general matter when a separate product becomes part of the structure itself.
[6] Appellants also maintain that the district court erred in applying the statutes of repose retroactively to preclude the claims of sixty-five class members. In light of our conclusions regarding the economic loss doctrine and strict products liability, we need not reach this issue. For a thorough discussion of the statutes of repose and their retroactive application, see G and H Assocs. v. Ernest W. Hahn, Inc., 113 Nev. 265, 934 P.2d 229 (1997).
[7] On June 3, 1999, two years after the rehearing petition was filed, various municipalities and counties filed a motion for leave to file an amicus brief in support of the City's cross-appeal. In light of our conclusion that we lack jurisdiction to consider the City's cross-appeal, we deny the motion as moot.
[1] Stern may arguably be read to imply that a plaintiff may recover purely economic losses in tort if he also has a contractual relationship with the defendant. Central Bit, in my view, dispels this notion in its holding that a plaintiff with express or implied indemnity rights must bring suit in contract, not in tort.
[2] The third and fourth of these corollaries were examined in the United States Supreme Court cases of East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), Saratoga Fishing Co. v. J. M. Martinac & Co., 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997), and in our decision in National Union Fire Insurance v. Pratt and Whitney, 107 Nev. 535, 815 P.2d 601 (1991). See the discussion below.
[3] Our cases have never made it clear what the Stern court meant by its statement of protection from tort liability in the "professional" setting. Certainly, economic losses without property damage or personal injury have been deemed recoverable in tort in connection with various types of professional malpractice/negligence claims.
[4] In Bernard v. Rockhill Development Co., 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987) (quoting Malone v. University of Kansas Medical Center, 220 Kan. 371, 552 P.2d 885, 888 (1976)), we observed:

A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement. A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract. Torts can, of course, be committed by parties to a contract. The question to be determined... is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties.
[5] Oak Grove cites Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971), for the limited proposition that strict tort liability applies to claims for property damage as well as to personal injury cases. This court did not reach "economic loss" issues in Worrell.
[6] See the first corollary to the rule discussed above.
[7] Central Bit was actually decided subsequent to Oak Grove.
[8] The reason I would not overturn Pratt and Whitney is that it would be difficult, if not impossible, to determine where to draw the line as to when the doctrine would be implicated when a commercial product injures itself. For example, an electric lamp can destroy itself because of an electric malfunction and is made up of component parts. No one could seriously debate whether the economic loss doctrine applies to a suit against the wiring manufacturer for loss of the lamp or loss of income from its projected use.
[9] This doctrine has recently been refined in Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997), in which economic losses were deemed recoverable where the product, a steamship, injured "other property," to wit: equipment added to the original assembly of a ship by the original purchaser.
[10] The majority correctly overturns Charlie Brown Construction Co. v. Boulder City, 106 Nev. 497, 797 P.2d 946 (1990). Charlie Brown is the one case that cannot be reconciled with any of our other decisions on the economic loss doctrine. Citing Hadley v. Baxendale, 156 Eng.Rep. 145 (1854), Charlie Brown, at least by implication, embraced in the tort context a rule of general foreseeability that has historically applied in contract but not in tort. Thus, taken literally, Charlie Brown arguably eviscerated the economic loss doctrine. I am certain this was not the intent of this court in Charlie Brown. Thus, it is important that we finally eliminate any misconceptions in this regard.
[11] See note 2.
[12] I take issue with the majority's reference to Casa Clara v. Charley Toppino, 620 So.2d 1244, 1247 (Fla.1993). New home purchasers do not generally have a "meaningful" ability to inspect houses for defects. Further, unlike the situation of a purchaser of a pre-owned residence, a new homebuyer's power to bargain over price in the modern market can only be described as marginal at best. Thus, I would reject such considerations in determining the efficacy of applying the economic loss doctrine in this context.
[13] In an appropriate future case, we may be called upon to determine whether lack of privity of contract between property owners and remote subcontractors bars recovery under various implied warranties when a defect in construction causes a problem that is restricted to economic loss (i.e., where the claimant is restricted to his, her or its recovery in contract). To the extent that building construction is treated by the majority as analogous to an integrated product for economic loss considerations, we may wish to examine whether this court's ruling in Hiles v. Johnston Pump Co., 93 Nev. 73, 560 P.2d 154 (1977), should apply by analogy to implied warranty claims made in this context. This issue is not before us because appellants' warranty claims were voluntarily dismissed below.