Michael L. DUGGAN, Individually and Next Friend of Mark Duggan and Corey Duggan, and Ann M. Duggan, Appellees,

v.

HALLMARK POOL MANUFACTURING COMPANY, INC., and Hallmark Pool Corporation, Appellants.

No. 85–704.

Supreme Court of Iowa.

Dec. 17, 1986.

As Amended Dec. 17, 1986.

Gene R. La Suer and Daniel J. Winegarden of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, and Michael W. Liebbe, Davenport, for appellants.

Tom Riley, T. Todd Becker, and Mary K. Hoefer, Cedar Rapids, for appellees.

Considered by REYNOLDSON, C.J., and HARRIS, SCHULTZ, LAVORATO, and NEUMAN, JJ.

HARRIS, Justice.

Plaintiff Duggan suffered tragic and permanent injuries in a motel swimming pool accident and brought this personal injury suit against the manufacturer, the dealer, and the motel. He reached settlements with the dealer and the motel and the case against the manufacturer proceeded to trial. The jury returned a plaintiffs' verdict and the manufacturer has appealed. We affirm in part, reverse in part and remand.

On the evening of February 19, 1982, Duggan, then thirty-two-years old, was a guest at the Highlander Inn, an Iowa City motel. He and a friend decided to go swimming at the motel's indoor pool. Noticing a number of children's toys floating near one end of the pool Duggan mistakenly assumed the shallow end of the pool was in fact the deep end. There were no depth markers along the rim of the pool and only small markers along its inner walls. The swimming area had no diving board. Based on this mistaken assumption Duggan dove headfirst into the shallow end of the pool, striking his head on the cement floor and severely injuring himself.

As a result of the accident Duggan is now a "C–6 Quadriplegic." He was hospitalized for four months after the accident with a burst fracture of his fifth cervical vertebra and a severed spinal cord. Now confined to a wheelchair for the rest of his life he has no sensation or motor function below the sixth cervical vertebra, is limited in the use of his arms to bicept and wrist extensions, and is unable to provide for his own personal hygiene and care. His wife, Ann, is now responsible for his feeding, physical therapy, dressing, and personal care.

The swimming pool at the Highlander Inn was a prefabricated fiberglass model, built about 1973 by Selzer Construction, and it was designed, manufactured, and distributed by the defendants (Hallmark).

It was the first pool ever built by Selzer. On Hallmark's recommendation Selzer hired an experienced pool consultant, Mr. Jack Du Plessis (another settling defendant), for aid and advice during construction of the Highlander pool. Selzer requested and obtained Hallmark's assistance in designing the pool.

Some alterations were made to the basic Hallmark design which included rounded corners, an additional set of steps, and an "alcove" in the deep end. Otherwise it retained the design of a standard Hallmark pool. According to the plaintiffs, the pool had inadequate underwater lighting, poorly placed and undersized depth markers, no warning signs that diving was prohibited, a larger deep end than the typical pool, and a construction ledge approximately three feet below the surface of the water in the deep end that allowed children to stand there and appear as if they were in shallow water. Hallmark claims that "Selzer failed to heed [its] warnings ... to comply with applicable safety standards," and cites a letter from Hallmark to Selzer which encouraged compliance with state safety standards.

On June 28, 1982, Duggan, his wife, and their children filed this lawsuit against Highlander Inn. By later amendments Selzer Construction, the defendants Hallmark, and the pool consultant were added as defendants. Various theories of recovery were alleged, including strict liability, negligent design, negligent construction, and negligence per se. (A further theory, "negligent failure to warn," though not alleged, was also submitted to the jury.) The case was scheduled for trial on March 11, 1985.

On March 8, 1985, the plaintiffs accepted a lump sum settlement of $1,050,000 from defendants other than Hallmark. The case against Hallmark then proceeded to trial. The jury returned special verdicts in favor of plaintiffs and assessed damages of $1,250,000 to Michael Duggan and $250,000 to Ann Duggan,[1] allocating the respective percentages of fault as follows:

| | |
|---|---|
| Michael Duggan: | 20% |
| Highlander Inn: | 30% |
| Hallmark Company: | 50% |
| Selzer Construction: | 0% |

By a special verdict the jury found defendants Hallmark strictly liable for the plaintiffs' injuries.

Subsequently the trial court held a hearing on the question of how the special verdicts should be interpreted. At the hearing Hallmark argued for the application of comparative fault to the jury's strict liability verdict and sought to have the common law "pro tanto set-off rule" applied to the full value of the pretrial settlement ($1,050,000). The defendants resisted recovery of more than the $1,500,000 awarded by the jury and sought to avoid liability by way of equitable contribution. The trial court entered judgment against Hallmark and in favor of Michael Duggan for $956,506.80, refusing to apply the doctrine of comparative fault to a strict liability verdict. No judgment was entered for the plaintiff Ann Duggan, as she had received $200,000 more from the settling defendants than the jury found to be her total damages. This appeal followed.

I. Defendant first challenges the submission of plaintiffs' strict liability claim. There are two contentions in the challenge. The defendant first claims that, as a "components part manufacturer," it cannot be held strictly liable for selling the finished product, a fully constructed swimming pool. In the alternative Hallmark asserts liability cannot attach because the pool was "substantially changed in condition" after it left its hands.

Hallmark cites Restatement (Second) of Torts section 402A (1965), which we adopted in *Hawkeye-Security Insurance Co. v. Ford Motor Co.*, 174 N.W.2d 672, 684 (Iowa 1970). Hallmark thinks component parts manufacturers are excluded from the strict liability prescribed by the cited Restatement section and, hence, it was error for the trial court to submit such

1. No damages were found for the Duggan children.

a theory. We need not resolve the question. *But see Cooley v. Quick Supply Co.,* 221 N.W.2d 763, 770 (Iowa 1984) (producer of dynamite fuses strictly liable for defective fuse even though it did not produce dynamite); *Union Supply Co. v. Pust,* 196 Colo. 162, 169, 583 P.2d 276, 281 (1978) (following majority view that manufacturer of component parts is strictly liable for injuries to consumer); *Caporale v. Raleigh Industries of America,* 382 So.2d 849 (Fla. Dist.Ct.App.1980) (manufacturer liable for improper assembly by its authorized dealer); *Dunson v. S.A. Allen, Inc.,* 355 So.2d 77 (Miss.1978) (defendant liable where its product, which could only be used in conjunction with another, was defective); Restatement (Second) of Torts § 402A comment q (1965) ("it is no doubt to be expected that where there is no change in the component part itself, but it is merely incorporated into something larger, the strict liability will be found to carry through to the ultimate user"); 72 C.J.S. *Products Liability* § 15 (1975). We have no record upon which to consider Hallmark's contention because the evidence clearly shows it did more than merely produce "component parts" of Highlander's swimming pool.

■ According to Hallmark's own manager the corporation offers several "standard" pool designs and "puts together a package and sell[s] it as a pool." Referring to the swimming pools they offer as "completely equipped," a Hallmark brochure refers to the company's product as a "pool," and not as "equipment" or "component parts." Hallmark does not supply concrete or an installation crew for its pool floors or decks, but rather it supplies fiberglass sidewalls, steps (which are identified as a Hallmark product), coping, filters, pumps, inlets, skimmers, lights, rope, ladders, diving boards, and suggested designs. Finally Hallmark literature emphasizes its "eighteen years of experience in designing, engineering, manufacturing, and construction of Hallmark fiberglass swimming pools." The record clearly establishes that Hallmark is, and perceives itself to be, in the business of designing and manufacturing fiberglass swimming pools, not mere

component parts. It is in no position to deny it is the manufacturer of the product involved here.

■ We of course do not suggest that strict liability is limited to those who control the whole of the manufacturing process. Plaintiffs correctly point out that strict liability can result from "designing" a defective product. *See Chown v. USM Corp.,* 297 N.W.2d 218, 221 (Iowa 1980).

■ Hallmark's alternative contention is that strict liability is inappropriate because the product underwent a "substantial change in condition" before reaching the consumer. The cited rule is clear but again the facts will not support its application. The rule is that "strict liability in tort should not extend to injuries which cannot be traced to the product 'as it reached the market.'" 63 Am.Jur.2d *Products Liability* § 548 (1984); *see* Annot., *Products Liability: Strict Liability in Tort,* 13 A.L. R.3d 1057, 1082 (1967).

■ These plaintiffs however convinced the jury that the pool was in a defective condition when it reached the stream of commerce. Plaintiffs' evidence showed that Hallmark designed and produced this pool with no diving board, a three-foot ledge, loose depth markers, and an uncharacteristic deep end. It does not appear that any departure from the design was substantial or unforeseeable.

It was not error to submit plaintiffs' strict liability claim.

II. Hallmark challenges another theory of tort recovery which was submitted for jury consideration. Restatement (Second) of Torts section 411 (1965) provides:

Negligence in selection of contractor:

An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

We have never been called upon to adopt this provision but plaintiffs now urge us to do so and, on the strength of it, approve a challenged jury instruction. By that instruction the trial court submitted plaintiffs' claim that Hallmark should be held liable for negligently selecting Selzer, not as a "contractor" (as contemplated by section 411), but as a franchisee.

It is inappropriate on this record to speculate whether, in a proper case, we would subscribe to section 411. If we did so it would not follow that the theory should be extended to include liability for the negligent selection of franchisees. At this point we are far from willing to accept plaintiffs' contention that one selling commercial rights under a franchise agreement should be held to the same standard of care that would bind a person selecting a contractor.

■ Whatever the merits of the recovery theory under section 411, or our doubts about its proposed expansion, we need not rule on either matter. We are spared from answering either question because we know from consistent special verdicts that the jury rejected the theory for application in this case. In one verdict it found that Selzer Construction Company was not negligent. In another it found Selzer's share of the comparative fault causing the accident amounted to zero.

Any error in submitting the theory was harmless.

III. Another assignment assails the trial court's refusal to make pro tanto adjustments to the jury's verdicts so as to properly reflect amounts received from other defendants in the pretrial settlement. The adjustments were in fact made on the basis of plaintiffs' counsel's own ad hoc allocation of the settlement.

After plaintiffs reached the $1,050,000 settlement with Highlander and Selzer that amount was allocated by plaintiffs (defendants did not participate in the allocation) as follows: Michael Duggan $550,000; Ann Duggan $450,000; Mark and Corey Dug-gan $50,000. The allocation, though unimportant to the settling defendants, becomes crucial to Hallmark. On the basis of plaintiffs' counsel's allocation the trial court ordered a net of $956,506.80 ($700,000 plus interest) of the jury's award to be paid to plaintiff Michael Duggan (whose damages were fixed by the jury at $1,250,000). Ann Duggan, having been allocated $450,000 of the pretrial settlement, stands to receive nothing more by virtue of her jury award ($250,000).

Hence, under the trial court order, the plaintiffs will receive a total of nearly $2,000,000 notwithstanding the jury's finding which fixed their total damages at $1,500,000.

■ In *Glidden v. German*, 360 N.W.2d 716, 722 (Iowa 1984), we held that our "pro tanto rule remains viable in cases not affected by Iowa's new comparative fault act...." Under the pro tanto rule, the entire amount received in any settlement should be "credited against [any] verdicts [returned] on a dollar-for-dollar basis." *Id.* at 718. *See also* Restatement (Second) of Torts § 885(3) (1979) (providing for the diminution of a recovery to the extent of payments made in settlement). We explained the basis for the pro tanto rule as follows:

> The theory underlying these decisions is that while a party is entitled to full compensation for his injuries, there can be only one satisfaction therefor.

*Glidden*, 360 N.W.2d at 718–19. *See also Wadle v. Jones*, 312 N.W.2d 510, 513 (Iowa 1981) (claimant is not entitled to recover more than full compensation for his personal injuries).

Because this case was filed before July 1, 1984 and tried after that date, statutory provisions for pro rata application of settlements contained in Iowa Code chapter 668 apply only to the extent necessary to determine the joint and several liability provisions of that chapter. The jury's finding that the pool manufacturer was fifty percent at fault makes any resort to that chapter inappropriate.

We agree with Hallmark that the trial court should have ignored the ad hoc allocation of the pretrial settlement and made the pro tanto reductions on the basis of the jury verdict, as follows:

| Plaintiff | Jury Verdict | | Less Proportionate Settlement Allocation | | Total Recovery From Verdict Awarded |
|---|---|---|---|---|---|
| Michael Duggan | $1,250,000 | − | $ 875,000 | = | $375,000 |
| Ann Duggan | $ 250,000 | − | $ 175,000 | = | $ 75,000 |
| Mark & Corey Duggan | $ 0 | − | $ 0 | = | $ 0 |
| TOTAL | $1,500,000 | − | $1,050,000 | = | $450,000 |

This is consistent with the method of allocation approved in *Jones v. City of Des Moines*, 355 N.W.2d 49, 52 (Iowa 1984) (multiple plaintiffs, each awarded damages by a jury, were entitled to recover only in the same ratio that their verdict bore to the sum of the plaintiffs' total recovery). The case must be remanded for entry of an order accordingly.

IV. We also find merit in Hallmark's challenge to the manner of awarding interest on the judgment. Prejudgment interest was ordered on the jury's total verdict, not reduced by the pro tanto adjustments previously mentioned.

Iowa Code section 535.3 (1985) allows interest on "judgments," not on verdicts. Judgment is the net amount of damage owed, after the verdict is reduced by any amount of plaintiff's percentage of the fault and by any pro tanto setoff. *Glidden*, 360 N.W.2d at 720. Interest accrues therefore only on the net judgment.

Upon remand the judgment must be further corrected to call for prejudgment interest only on the amount of net recovery.

V. Hallmark invites us to overrule our holding in *Speck v. Unit Handling Division*, 366 N.W.2d 543, 546 (Iowa 1985) (comparative fault inapplicable in strict liability claims). We decline.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.