136 Nev., Advance Opinion 52

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

CHARLES SCHUELER,
Appellant,
vs.
AD ART, INC., A FOREIGN
CORPORATION,
Respondent.

No. 75688-COA

FILED

JUL 30 2020

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order granting summary judgment in a tort action. Eighth Judicial District Court, Clark County; Michael Villani, Judge.

*Reversed and remanded.*

Brenske & Andreevski and William R. Brenske, Jennifer Andreevski, and Ryan D. Krametbauer, Las Vegas,
for Appellant.

Ray Lego & Associates and Timothy F. Hunter, Las Vegas,
for Respondent.

Kravitz Schnitzer Johnson, a Professional Corporation, and Alexandra B. McLeod, M. Bradley Johnson, and Bianca Gonzalez, Las Vegas,
for Amicus Curiae Las Vegas Defense Lawyers.

Robison, Sharp, Sullivan & Brust and Therese M. Shanks, Reno,
for Amicus Curiae Nevada Justice Association.

20-27744

BEFORE GIBBONS, C.J., TAO and BULLA, JJ.

*OPINION*

By the Court, BULLA, J.:

This appeal arises from a tort action sounding in strict products liability. Appellant Charles Schueler was seriously injured while servicing a large MGM Grand sign located atop a 150-foot tall steel pylon.[1] Schueler asserts that respondent Ad Art, Inc., designed, manufactured, and sold the allegedly defective sign to MGM and, therefore, should be strictly liable for his injuries. The district court granted summary judgment in Ad Art's favor, concluding that the sign was not a product for purposes of applying strict products liability.

In this opinion, we address what constitutes a "product" within the context of the doctrine of strict products liability and, specifically, the doctrine's applicability to large fixtures such as the MGM sign. Preliminarily, we discuss the pertinent history of strict products liability and whether a limiting definition of "product" should be adopted in Nevada. We next examine whether large signs, like the MGM sign, are products within the contemplation of section 402A of the Second Restatement of Torts, where, as here, the party allegedly engaged in producing and

---

[1]The sign is situated in front of the MGM Grand Resort and Casino on the east side of Las Vegas Boulevard, facing north and south, and features displays on both sides. Specifically, the sign incorporates the MGM's lion logo, large lighted MGM letters, and multiple LED screens that feature various attractions. Although this type of sign is often referred to as a pylon sign, only the display portion of the MGM sign, which is located at the top of the pylon tower, is at issue in this case.

designing the sign was in the business of making such signs. In doing so, we address the relevance of *Calloway v. City of Reno*,[2] on which both parties rely. Finally, we address the relevant arguments raised in this appeal, including whether custom-made products are exempt from the doctrine of strict liability and whether the policy considerations underlying the doctrine of strict products liability provide the appropriate basis for determining whether the MGM pylon sign falls within the ambit of strict products liability.

Applying the principles set forth in section 402A of the Second Restatement of Torts, as well as relevant jurisprudence, we hold that the MGM sign is a product for purposes of strict liability, and therefore, the district court erred when it concluded that the sign was not a product within the contemplation of the doctrine of strict products liability. Consequently, we reverse and remand.

## I.

Ad Art is a commercial sign manufacturer that has existed in various corporate iterations since at least 1968.[3] In 1993, MGM

---

[2]116 Nev. 250, 993 P.2d 1259 (2000).

[3]We recognize that Ad Art raised the issue of successor liability in the district court and that this issue is indeed a contentious one, involving unresolved factual disputes. The district court, however, did not reach the successor liability issue in its order granting summary judgment, and therefore, the matter is not before this court. *See N. Nev. Ass'n of Injured Workers v. Nev. State Indus. Ins. Sys.*, 107 Nev. 108, 111 n.3, 807 P.2d 728, 730 n.3 (1991) (declining to address an issue the district court did not rule on in the first instance). Accordingly, we express no opinion as to whether successor liability should adhere to Ad Art in the instant case, and nothing in this opinion should be construed as a resolution of that issue. With that said, for purposes of our analysis herein, in general terms, we treat Ad Art

commissioned Ad Art to design, manufacture, and install its sign. Between 1993 and 1994, Ad Art and local Las Vegas construction subcontractors installed a 150-foot tall steel pylon embedded in a concrete foundation on MGM's property, and then Ad Art mounted and installed its large sign on top of the steel pylon. Ad Art employees designed, engineered, and managed the production and installation of the sign. Ad Art fabricated the sign in sections at its manufacturing facility in Stockton, California, and then shipped the sign by way of truck to Las Vegas, where it was subsequently attached to the pylon. According to Terry Long, Ad Art's president at the time, "the installation of the MGM pylon was done by [Ad Art's] people" with the assistance of some necessary third-party contractors, and after the installation was completed as intended, "Ad Art didn't do any changing of the sign." In 2013, MGM hired Schueler to service the pylon sign's LED display. While Schueler was walking on the sign's interior platform, a panel of Alucobond, which was affixed to the floor as part of the sign's original design, allegedly failed, causing Schueler to fall 150 feet to the ground below. As a result, Schueler suffered serious bodily injury.

Schueler filed a complaint against Ad Art, alleging, among others, a cause of action sounding in strict products liability. Ad Art filed a motion for summary judgment, arguing that it was not a successor corporation; that the MGM sign was not a product for purposes of strict liability; and that the statute of repose was applicable. The district court initially denied the motion, concluding that Ad Art was in the business of manufacturing signs, that the sign was a product subject to strict liability claims, and that one-of-a-kind products are not precluded from strict

_____

as the manufacturer of the MGM pylon sign that was produced in the early 1990s.

liability claims. Ad Art moved for reconsideration and argued that it was not subject to successor liability and that the sign was not a product for purposes of strict liability. Upon reconsideration, the district court reversed course and granted Ad Art's motion for summary judgment. Specifically, the district court concluded that the sign was not a product that is subject to the doctrine of strict liability. The district court, however, did not reach the issue of successor liability. Schueler now appeals.

## II.

We review a district court's decision to grant summary judgment de novo. *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). Summary judgment is proper if the pleadings and all other evidence on file demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Id.* All evidence must be viewed in the light most favorable to the nonmoving party. *Id.* On appeal from a summary judgment, this court may be required "to determine whether the law has been correctly perceived and applied by the district court." *Evans v. Samuels*, 119 Nev. 378, 380, 75 P.3d 361, 363 (2003) (internal quotation marks omitted).

## III.

Before addressing the specifics of Schueler's appeal, a discussion regarding the history of strict products liability and its policy objectives is appropriate. The doctrine of strict products liability finds its genesis in the nineteenth-century English case, *Winterbottom v. Wright*.[4] 2 Dan B. Dobbs, Paul T. Hayden, and Ellen M. Bublick, *The Law of Torts* § 450 (2d ed. 2017) (hereinafter, *Law of Torts*). There, the court fashioned

---

[4](1842) 10 M. & W. 109; 152 Eng. Rep. 402 (Exch. Pl.).

the privity rule, holding that a negligent manufacturer is generally not liable for injuries caused by its defective products *unless* the victim is the person who actually purchased the product. *Id.* Courts in the United States adopted the holding in *Winterbottom*, and the privity rule survived into the twentieth century. *Id.* In *MacPherson v. Buick Motor Co.*, 111 N.E. 1050 (N.Y. 1916), an opinion authored by Judge Benjamin Cardozo, the New York Court of Appeals effectively abolished the privity requirement in negligence cases, and subsequently, *MacPherson* was adopted and applied in numerous jurisdictions. *Law of Torts, supra*, § 450, at 893.

Although plaintiffs who lacked privity could now theoretically recover from manufacturers in negligence, this was an onerous process and often bore no fruit because negligence was quite difficult to prove in this type of case. *Id.* This is so because plaintiffs were required "to prove that a particular party in the product-supply chain had failed to exercise due care." Kyle Graham, *Strict Products Liability at 50: Four Histories*, 98 Marq. L. Rev. 555, 568-69 (2014). As a result, plaintiffs began bringing defective product claims under contract theories, rather than in tort, specifically claims for breach of express or implied warranty; thus, if the plaintiff proved such a breach, the manufacturer would be liable in contract, and the plaintiff need not prove fault. *Law of Torts, supra*, § 450, at 893-94.

Because warranty theories of recovery reintroduced the privity problem, courts again began crafting exceptions to the rule. *Id.* And in 1960, the New Jersey Supreme Court eliminated the privity rule in warranty cases altogether, holding that an implied-warranty claim could survive absent privity and despite manufacturers' disclaimers. *Henningsen v. Bloomfield Motors, Inc.*, 161 A.2d 69, 80-84, 99-101 (N.J. 1960). But,

three years later, the *Henningsen* holding was surpassed by the California Supreme Court's decision in *Greenman v. Yuba Power Products, Inc.*, 377 P.2d 897 (Cal. 1963), "which shifted the focus of products-liability reform from warranty protections to 'pure' tort law." Graham, *Strict Products Liability*, *supra*, at 576.

In *Greenman*, a case involving a defective power tool, the court held, "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." 377 P.2d at 900. The *Greenman* court went on to explain why tort, rather than contract, was the more appropriate vehicle for strict liability claims. *Id.* at 901. The court noted specifically that abandonment of the privity rule "make[s] clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort." *Id.* Moreover, the court concluded, "[t]he purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Id.* In sum, "the *Greenman* court regarded warranty as still too closely tethered to the law of sales to provide an adequate basis for an obligation imposed for public-policy reasons." Graham, *Strict Products Liability*, *supra*, at 577.

Building on *Greenman*, Dean William Prosser incorporated and advanced the ideas expressed therein in the Restatement (Second) of Torts section 402A. *Law of Torts*, *supra*, § 450, at 894 (discussing Dean Prosser's involvement in the drafting of the Second Restatement). Section 402A provides that if a product is defective and that defect causes harm to person or property, liability will be imposed upon the manufacturer or distributors,

notwithstanding the manufacturer's or distributors' lack of fault and whether or not they were in privity with the plaintiff.[5]  Thus, Prosser concisely formulated and promulgated the holding in *Greenman*, and soon after, courts "widely adopted section 402A." *Law of Torts*, *supra*, § 450, at 894 (noting that some jurisdictions retained implied-warranty theories of recovery).

Although policy rationales underpinning the doctrine vary to one degree or another, they are generally consistent and always have the consumer's or ultimate user's ability to recover in mind.  *See, e.g.*, *Law of Torts*, *supra*, § 450, at 895-96 (citing compensation, loss spreading,

---

[5]Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the *user* or consumer or to his property is subject to liability for physical harm thereby caused to the *ultimate user* or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it sold.

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (Am. Law Inst. 1965) (emphases added).

deterrence, and representation as policy objectives); *see also* Restatement (Second) of Torts § 402A cmt. c (same). Likewise, in *Calloway v. City of Reno*, the Nevada Supreme Court identified three policy rationales supporting the doctrine of strict liability: (1) "promot[ing] safety by eliminating the negligence requirement" (deterrence); (2) "spread[ing] the costs of damage from dangerously defective products to the consumer by imposing them on the manufacturer or seller" (loss spreading); and (3) "concerns about a plaintiff's ability to prove a remote manufacturer's or seller's negligence" (representation and deterrence). 116 Nev. 250, 268, 993 P.2d 1259, 1271 (2000), *overruled on other grounds by Olson v. Richard*, 120 Nev. 240, 241, 89 P.3d 31, 31-32 (2004). Consequently, the rationales are generally well defined, consistent, and aimed at protecting users and consumers by providing an avenue of recovery for losses sustained as a result of defective products.

Importantly, the Nevada Supreme Court has traditionally embraced these principles and long recognized that the doctrine of strict products liability in tort is governed by the Restatement (Second) of Torts section 402A. *See, e.g., Rivera v. Philip Morris, Inc.*, 125 Nev. 185, 192-93, 209 P.3d 271, 276 (2009) (stating that "[t]he Restatement (Second) of Torts section 402A governs strict product liability"); *Calloway*, 116 Nev. at 268, 993 P.2d at 1270-71 (referencing and quoting section 402A); *see also Shoshone Coca-Cola Bottling Co. v. Dolinski*, 82 Nev. 439, 441-42, 420 P.2d 855, 857 (1966) (recognizing the doctrine of strict products liability, citing Dean Prosser).

IV.

A.

With this historical understanding in mind, we now focus our discussion on the proper method for determining whether an item or good is a "product" for the singular purpose of applying the doctrine of strict products liability. The determination of whether something constitutes a product for purposes of strict liability is a question of law, which is to be settled by the court. *Brooks v. Eugene Burger Mgmt. Corp.*, 264 Cal. Rptr. 756, 764 (Ct. App. 1989) ("[W]hether or not the subject object or instrumentality is a 'product' is a question of law for the trial court and subject to de novo review by [the reviewing court] upon appeal."); *see also* Restatement (Third) of Torts: Prod. Liab. § 19 cmt. a (Am. Law Inst. 1998) ("[I]n every instance it is for the court to determine as a matter of law whether something is, or is not, a product.").

Although courts must determine as a matter of law whether a particular item or instrumentality is a product for purposes of strict liability, doing so is not necessarily an elementary undertaking. This is so, in part, because the Second Restatement does not provide a standard definition of what constitutes a product. Instead, it employs the policy objectives referenced above, along with examples of items that ordinarily would be considered products. Specifically, comment d of section 402A provides a nonexhaustive list of tangible items to which the doctrine applies, including "an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide," whereas comment c articulates the policy rationales

 

underpinning the doctrine.[6] Thus, it appears that the drafters assumed that courts would develop the doctrine of strict liability via the common law by applying the policy objectives to the facts of the case presented, while simultaneously using the nonexhaustive list of items and goods in comment d as guideposts to ensure adherence to the doctrine's stated purpose. In other words, section 402A purposely did not provide a precise definition of product and instead supplied the framework for a case-by-case methodology for determining whether an item is or is not a product for purposes of strict liability.

B.

Notably, the parties fundamentally disagree about what bestows product status upon an item or instrumentality for purposes of imposing strict products liability. Neither the Nevada Legislature nor the Nevada Supreme Court have adopted a fixed or limited definition of "product" in this context, but the supreme court has recognized the policy objectives articulated in section 402A. *Calloway*, 116 Nev. at 268, 993 P.2d at 1270-71. Nonetheless, our corpus of law contains no clear method for determining whether an item or good is a product as it relates to strict products liability.

---

[6]Those policy rationales include (1) "that the seller . . . has undertaken and assumed a special responsibility toward . . . the consuming public who may be injured by [its products]"; (2) "that the public has the right to and does expect . . . that reputable sellers will stand behind their goods"; (3) "that public policy demands that the burden of accidental injuries caused by products or consumption be placed upon those who market them, and be treated as cost of production"; and (4) "that the consumer [or user] of such products is entitled to the maximum of protection . . . and the proper persons to afford it are those who market the products." Restatement (Second) of Torts § 402A cmt. c (Am. Law Inst. 1965).

In the interest of resolving this unanswered question, this court issued an order directing supplemental briefing and inviting participation by amicus curiae on the following question: "What is the proper definition of a product under Nevada products liability law for purposes of strict liability?" *Schueler v. Ad Art, Inc.*, Docket No. 75688-COA (Order Directing Supplemental Briefing and Inviting Participation by Amicus Curiae, August 22, 2019).

In Schueler's supplemental brief, he argues that this court should not adopt a standard definition of product and, instead, recommends a case-by-case approach, focusing on the public policy objectives that underpin the doctrine of strict liability. The Nevada Justice Association filed an amicus brief in support of Schueler, wherein it argues for the adoption of the definition set forth in the Restatement (Third) of Torts. Ad Art, on the other hand, does not address the question directly—but appears to argue for a case-by-case inquiry. Additionally, Las Vegas Defense Lawyers filed an amicus brief and proffered the following definition of a product: "a manufactured good capable of traveling through interstate commerce."

After careful consideration, we conclude that adopting a fixed definition of product for purposes of strict liability, such as the Third Restatement's, is not necessary for two reasons. First, applying the policy objectives articulated in section 402A, including judicial interpretations and expansions thereof, is sufficient to resolve the question presented, and therefore, adopting a limited definition of product is unwarranted at this time.

Second, and more important, we conclude that utilizing a case-by-case methodology is the more prudent approach. Although some state legislatures have adopted statutory definitions defining what constitutes a product for purposes of strict liability, e.g., Indiana and Washington,[7] courts have largely shied away from concentrating on dictionary definitions and instead focused on the doctrine's policy objectives. *See, e.g., Fluor Corp. v. Jeppesen & Co.*, 216 Cal. Rptr. 68, 71 (Ct. App. 1985) (explaining "that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product" (internal quotation marks omitted)); *Lowrie v. City of Evanston*, 365 N.E.2d 923, 928 (Ill. App. Ct. 1977) ("[W]e are of the belief that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product within the meaning of . . . the Restatement."). Thus, as a general rule, the doctrine's application should be avoided where its policy objectives are not implicated. This is true even in cases where the allegedly defective product is one that would typically fall within the ambit of strict liability, but, for fact-specific reasons, does not. *See, e.g., Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661, 671-73 (Ohio 1995) (concluding that because the plaintiff was heavily involved in the design and production of the defective product, the imposition of strict liability did not further the doctrine's policy objectives).

The case-by-case approach also allows the doctrine to adapt to technological advances, *see, e.g., Kaneko v. Hilo Coast Processing*, 654 P.2d 343, 349 (Haw. 1982) ("In order to cope with technological advances, we decline to establish a firm definition of 'product' to which the doctrine of

---

[7]*See* Ind. Stat. Ann. § 34-6-2-114 (LexisNexis 2019); Wash. Rev. Code Ann. § 7.72.010 (West 2017).

strict liability applies."), which is particularly beneficial in the current climate where advances in technology occur frequently. Moreover, as mentioned above, the case-by-case approach is consistent with the text and spirit of section 402A of the Second Restatement. Further, the case-by-case approach finds support in our jurisprudence, which focuses on public policy considerations in applying the doctrine of strict liability. *See Calloway v. City of Reno*, 116 Nev. 250, 268, 993 P.2d 1259, 1271 (2000) (citing Prosser and Keeton and discussing policy rationales).

Accordingly, we conclude that the case-by-case approach is the superior methodology because it is versatile, permitting courts to analyze each case individually and adjust to changes in technology, and because it is consistent with the text and purpose of section 402A. Therefore, when determining whether an item or instrumentality is a product that falls within the scope of strict products liability, courts *must* apply section 402A of the Second Restatement, including the public policy objectives of the doctrine as well as the relevant precedents interpreting section 402A.

This is not to say, of course, that courts are never permitted to use appropriate definitions as guidance when determining whether an item is indeed a product for purposes of strict liability. A court, for example, may find useful the definition of product found in the Restatement (Third) of Torts, which states that "[a] product is tangible personal property distributed commercially for use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to [that] of tangible personal property." Restatement (Third) of Torts: Prod. Liab. § 19 (Am. Law Inst. 1998). Nevertheless, while this or a similar definition may be beneficial to a court when utilizing the case-by-case approach, it is not a shortcut for avoiding

consideration of the policy objectives discussed above. Accordingly, if a court chooses to employ such a definition to assist it in determining whether an item or good is a product for purposes of strict liability, that court must still apply the relevant policy objectives of section 402A to establish whether the item is or is not a product within the meaning of the doctrine of strict products liability.

V.

Having concluded that the case-by-case approach in accordance with section 402A is the best method for determining whether the MGM pylon sign constitutes a product within the meaning of the doctrine of strict products liability, we now turn to the merits of the dispute. On appeal, Schueler argues that the district court erred when it granted Ad Art's motion for summary judgment. Specifically, Schueler contends that the district court incorrectly determined that the MGM pylon sign is not a product for purposes of strict product liability. Relying on *Calloway*, as well as various extra-jurisdictional cases, Ad Art asserts that the district court correctly found that the MGM sign is not a product for purposes of strict liability, and therefore, the district court properly granted summary judgment in its favor.

In analyzing Ad Art's motion for reconsideration on its motion for summary judgment, the district court accepted Ad Art's reasoning that the sign was not a product and concluded that "[t]he question of whether the MGM Pylon is a product" for purposes of strict liability turned on the supreme court's holding in *Calloway*. The district court went on to find that the *Calloway* court "held that townhomes 'were not products for purposes of strict products liability,'" and that "[t]he *Calloway* court specifically overruled [*Worrell v. Barnes*, 87 Nev. 204, 484 P.2d 573 (1971)] with respect

to its application of strict products liability." The district court also concluded, relying on *Martens v. MCL Construction Corp.*, 807 N.E.2d 480 (Ill. App. Ct. 2004) (component parts), and *Dayberry v. City of East Helena*, 80 P.3d 1218 (Mont. 2003) (municipal swimming pool), that indivisible component parts, "such as bricks, supporting beams, and railings," are exempt from the doctrine of strict liability, and because "the MGM Pylon sign is [a] one of a kind object and not mass produced," it is not in the stream of commerce and thus "not a product for strict liability purposes."

## A.

We conclude that the district court misinterpreted and misapplied *Calloway*'s holding. In *Calloway*, a group of homeowners filed a class action suit against the project developer, general contractor, various subcontractors, and the City of Reno, alleging construction defect claims in warranty, negligence, and strict products liability. 116 Nev. at 254, 993 P.2d at 1261-62. The subcontractors and the City moved for summary judgment on the claims against them. *Id.* at 255, 271, 993 P.2d at 1262, 1272. The district court granted the motion as to the negligence claims, reasoning that the economic loss doctrine barred the claims sounding in negligence "and that [the homeowners] had to rely on their contractual remedies to recover for economic losses." *Id.* The district court also summarily dismissed the homeowners' strict liability claims against the subcontractors and the City on the basis that "a townhouse is not a product." *Id.* at 255, 268, 993 P.2d at 1262, 1270.

Thereafter, the homeowners settled their claims against the developer and general contractor but appealed the district court's ruling as to the subcontractors and the City. *Id.* at 255, 993 P.2d at 1262-63. On

appeal, the supreme court affirmed the district court, explaining that since the homeowners' losses were purely economic, the doctrine of strict liability was unavailable because "its application is limited to personal injury and property damage." *Id.* at 268, 993 P.2d at 1270 (quoting *Culinary Workers Union, Local No. 226 v. Stern*, 98 Nev. 409, 411, 651 P.2d 637, 638 (1982)). Furthermore, the court concluded, "we agree with the district court's conclusion, *in this instance*, that the townhouses are not 'products' for purposes of strict products liability." *Id.* (emphasis added). As evidenced by the court's qualifying language, "in this instance," the holding in *Calloway* is narrow and confined to the specific facts of that case, and does not, as the district court concluded here, stand for the broad proposition that townhouses are never products for purposes of strict liability.

In reasoning that *Calloway* excludes buildings from the doctrine of strict liability, both the district court and Ad Art appear to rely on the court's discussion of buildings as products (or non-products) and its overruling of *Worrell*. This reliance, however, is misplaced. To be sure, the *Calloway* court did explain that "[s]ome courts have concluded that a building can constitute a 'product' under strict products liability," whereas others "have concluded that strict products liability does not apply to buildings." *Id.* at 268-69, 993 P.2d at 1271. And although the court cited authorities regarding both legal theories, it did not opine on which method is better, nor did it expressly incorporate either approach into Nevada law. Instead, the court immediately segued into its discussion of *Worrell v. Barnes*, 87 Nev. 204, 484 P.2d 573 (1971)—a case involving a contractor

who, during a remodeling project, installed a leaky gas line fitting in the plaintiff's home that failed and caused fire damage.[8]

Ultimately, the *Calloway* court overruled *Worrell*, holding that "[t]he contractor who installed the gas line fitting [there] should not have been subject to the doctrine of strict products liability" because he was "not engaged in the business of 'manufacturing' or selling" the defective product—i.e., the gas line fitting—which section 402A of the Restatement requires. *Calloway*, 116 Nev. at 270-71, 993 P.2d at 1272. Thus, the fact that *Worrell* involved a building was collateral to the court's holding, as the issue turned on whether the contractor was a seller or manufacturer of the faulty product, and the *Calloway* court concluded he was not, hence the overruling. In other words, the court overruled *Worrell* not strictly because the case involved a building, but because the contractor, who simply installed the gas line fitting, was not a seller or manufacturer and should have never been subjected to a strict products liability claim.

In addition, the *Calloway* court's primary ground for affirming the district court's refusal to apply the doctrine of strict products liability

---

[8]In *Worrell*, a homeowner hired a contractor to do some remodeling, which "consisted of some carpentry work and the connection of various appliances in the house to an already existing liquefied petroleum gas system." 87 Nev. at 205, 484 P.2d at 574. The contractor did not supply the appliances, but the project required him to install a gas line for a new water heater. *Id.* As it turned out, however, the gas line had a leaky fitting, and the leak eventually caused a fire that damaged the house and personal property therein. *Id.* at 206, 484 P.2d at 574-75. The homeowner sued the contractor for negligence, strict liability, and breach of warranty. *Id.* at 206, 484 P.2d at 575. The district court dismissed the strict liability and warranty claims, and the jury returned a verdict for the defendant on the negligence claim. *Id.* On appeal, the supreme court reversed. *Id.* at 208-09, 484 P.2d at 576.

was based on the economic loss doctrine, not the nature of the product itself (i.e., townhomes). As the court noted, "[t]he doctrine of strict products liability was developed to assist plaintiffs who could not prove that products which caused physical injury at the point of use had been manufactured negligently." *Calloway*, 116 Nev. at 268, 993 P.2d at 1270 (alteration in original) (quoting *Local Joint Exec. Bd. v. Stern*, 98 Nev. 409, 411, 651 P.2d 637, 638 (1982)). But, where a plaintiff seeks to recover purely economic losses, the doctrine of strict liability is unavailable because "its application is limited to personal injury and property damage [other than the product itself]." *Id.* Therefore, the court reasoned that because the "appellants seek to recover purely economic loss with respect to the defective townhouses," the district court correctly dismissed their strict liability claims pursuant to the economic loss doctrine. *Id.* Only after reaching this conclusion did the court conclude that "[m]oreover, we agree with the district court's conclusion, *in this instance*, that the townhouses are not 'products' for purposes of strict products liability." *Id.* (emphasis added). *Calloway*'s holding therefore can be reduced to three components: (1) parties alleging only economic loss cannot invoke the doctrine of strict products liability and instead must rely on warranty claims, 116 Nev. at 268, 993 P.2d at 1270; (2) strict products liability claims are viable *only* against those who are engaged in the business of selling or manufacturing the defective product in question; and (3) "the structures at issue in [that] case [were] not 'products' for purposes of strict products liability," *id.* at 254, 993 P.2d at 1261.

Accordingly, there is no language in *Calloway* that unequivocally and categorically removes buildings, or manufacturers thereof, from the ambit of strict products liability, and there certainly is no language that addresses large commercial fixtures such as the sign at issue here. However, even if *Calloway* did stand for the proposition that buildings are not products in the context of strict liability, it would be inapposite here because this case involves a sign (albeit a large one), and not a building designed for human occupancy like the townhouses in *Calloway*. As Schueler noted during oral argument, although the 150-foot tall pylon is permanently affixed to a concrete foundation, the sign itself can be removed from the top of the pylon and transported elsewhere, something generally not true of buildings or residential homes. Thus, to the extent that *Calloway* precludes buildings from the application of strict products liability, we decline to expand its holding, as the district court did, to conclude that the MGM pylon sign is akin to a commercial or residential building, thereby precluding the application of strict products liability.

B.

Applying this understanding of *Calloway* to the instant case, we hold that the district court's conclusion that the MGM pylon sign is not a product for purposes of strict products liability fails as a matter of law. First, the district court's conclusion that the MGM pylon sign is not a product is predicated on the premise that, under *Calloway*, buildings (e.g., townhomes) are exempt from the doctrine of strict liability. As explained, *Calloway* does not demand such a conclusion. Even if *Calloway* did permit such an inference, however, the district court's conclusion would still be erroneous because the MGM pylon sign is a commercial sign, not a building intended or designed for human occupancy. And neither Ad Art nor the

district court cited to any relevant or persuasive authority supporting the supposition that commercial pylon signs are significantly analogous to buildings so as to remove them from the sphere of strict liability. In fact, Ad Art failed to cite any authority which states that large commercial signs or the like ought to be treated as buildings for purposes of strict liability. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (rejecting arguments that are not supported by relevant authority). Nor is this court aware of any authority that has reached that or a similar conclusion. Moreover, unlike a building or home, the sign itself can be detached from the steel pylon on which it rests, moved somewhere else, and replaced with a different sign mounted on top of the same pylon.

Second, Schueler is not claiming only economic loss. Indeed, his complaint alleges that he fell 150 feet while servicing the pylon sign, resulting in *serious bodily injury*. Third, Ad Art built and sold the pylon sign to MGM, and Ad Art was in the business of selling and manufacturing commercial signs. Unlike the defendants in *Calloway* or *Worrell*, Ad Art was not simply a subcontractor or installer of component parts. On the contrary, the 1993 work permit lists Ad Art as the general contractor, and the record further indicates that Ad Art built, sold, and designed the MGM pylon sign. Therefore, the district court misapplied *Calloway* when it granted summary judgment for Ad Art.

C.

The district court also committed legal error when it concluded that because "the MGM Pylon sign is [a] one of a kind object and not mass produced," it is not in the stream of commerce and thus "not a product for

COURT OF APPEALS
OF
NEVADA

(O) 1947B

strict liability purposes."[9] Contrary to the district court's conclusion, a product need not be mass-produced to be in the stream of commerce, nor are unique products excluded from the realm of strict liability. The term stream of commerce does not appear in the Restatement Second, and generally, "the phrase has been used by courts to make the distinction between the one time or casual seller to whom strict products liability does not apply and a defendant engaged in the business of selling products." *Boddie v. Litton Unit Handling Sys.*, 455 N.E.2d 142, 149 (Ill. App. Ct. 1983); *see also* 63 Am. Jur. 2d *Products Liability* § 658 (1997). In this case, Ad Art was engaged in the business of making and selling commercial signs; therefore, its products are inescapably in the stream of commerce.

Furthermore, the great weight of authority rejects the notion that unique or custom-made items or goods are not products for purposes of strict liability, especially where, as here, the defendant builds and sells such products in the ordinary course of its business. *See, e.g., Wirth v. Clark Equip. Co.*, 457 F.2d 1262, 1267 (9th Cir. 1972) ("We think that the custom-built concept need not be fatal to the plaintiff's case . . . , [as] the basic structure of the machine here concerned was . . . developed and advertised by the defendant."); *Munhoven v. Northwind Marine, Inc.*, 353 F. Supp. 2d 1072, 1074 (D. Alaska 2005) (relying on section 402A, the court rejected defendant's argument that a skiff was not a product for purposes of strict

---

[9]Insofar as Ad Art or the district court suggest that the pylon sign has been integrated into the hotel or casino, we reject this argument. *See Calloway*, 116 Nev. at 271 n.5, 993 P.2d at 1272 n.5; *Keck v. Dryvit Sys., Inc.*, 830 So. 2d 1, 7 (Ala. 2002); *see also Martens*, 807 N.E.2d at 493-94. Moreover, because we conclude the sign is not a building, the Alucobond flooring of the sign is not an indivisible component part of a building that works to exempt the pylon sign from the doctrine of strict liability.

liability because it was custom and not mass produced, holding "[t]here is nothing in Alaskan law, nor the Restatement, imposing such a requirement"); *Boddie*, 455 N.E.2d at 149 (concluding that a custom conveyor system was a product for purposes of strict liability because the defendant was engaged in the business of selling such products and marketed them to buyers); *Sprung v. MTR Ravensburg, Inc.*, 788 N.E.2d 620, 623-24 (N.Y. 2003) (holding that the defendant was not a casual seller because "the product was built for market sale in the regular course of the manufacturer's business," despite the fact that it was one-time, custom fabrication); *see also* 63 Am. Jur. 2d *Products Liability* § 658 (1997) (explaining there is no requirement that the product "be mass-produced or widely marketed, and it is sufficient if a seller is engaged in the business of selling a product, and markets it to a buyer for the buyer's use").

Here, Ad Art was engaged in the business of selling and producing commercial signs, it marketed those signs to buyers, and, as shown *supra*, a product's classification as unique, custom, or one-of-a-kind will not by itself remove it from the doctrine of strict liability. Further, accepting such an argument in this context would potentially lead to absurd results. This is so because, to one degree or another, most commercial signs are inherently unique since they are designed to conform to the specifications of a particular building or piece of real estate and adorned with a business's precise (and perhaps unique) font and logo. Thus, this proposition, if taken to its logical conclusion, would largely insulate commercial sign manufacturers from claims sounding in strict liability, which surely is inconsistent with the doctrine's intent; nor is it a proposition that this court is willing to endorse.

Therefore, we hold that large commercial signs, such as the MGM pylon sign, are products for purposes of strict liability, when, as here, the sign was designed, manufactured, and sold by a party engaged in the business of selling and manufacturing such signs. Furthermore, that a product is custom-made is not sufficient on its own to remove it from the province of strict liability.[10]

Accordingly, Schueler's cause of action sounding in strict products liability is, on its face, viable as against Ad Art because the pylon sign qualifies as a product pursuant to the application of section 402A. Simply stated, Ad Art, as the manufacturer and seller of the MGM pylon sign, cannot avoid the imposition of strict liability by arguing the sign is not a "product" when it was in the business of manufacturing and selling commercial signs.

VI.

Ad Art nevertheless urges this court to affirm the district court's summary judgment order, positing that the policy objectives of strict liability would *not* be furthered by concluding that the MGM pylon sign is a product for purposes of strict liability, and that because the pylon sign is an immovable real estate fixture, it is exempt from strict products liability. We disagree.

In *Calloway*, the Supreme Court of Nevada identified three policy objectives and rationales underpinning the doctrine of strict liability: (1) "promot[ing] safety by eliminating the negligence requirement,"

___

[10]We recognize, however, that not all large, commercial signs are automatically products for purposes of applying strict liability, and we can imagine scenarios involving different facts and circumstances where a sign similar to the one at issue in this case may not be considered a product for purposes of strict liability.

(2) "spread[ing] the costs of damage from dangerously defective products to the consumer by imposing them on the manufacturer or seller," and (3) removing "concerns about a plaintiff's ability to prove a remote manufacturer's or seller's negligence." *Calloway*, 116 Nev. at 268, 993 P.2d at 1271; *see also* Restatement (Second) of Torts § 402A (Am. Law Inst. 1965). Applying these public policy objectives to this case, we conclude that the MGM sign qualifies as a product for purposes of applying strict liability, contrary to Ad Art's position, as explained more fully below.

A.

Ad Art first contends, and the district court agreed, that the application of strict liability would not promote safety in this instance because "MGM was involved in every aspect of the [sign's] design, and it was not simply the creation of [Ad Art]." This assertion, however, is unsupported by the record, and therefore, this finding is clearly erroneous. *Allyn v. McDonald*, 112 Nev. 68, 72, 910 P.2d 263, 266 (1996) (rejecting a district court's findings of fact in a summary judgment order where the findings were clearly erroneous).

At the time the MGM pylon sign was originally designed and constructed, Terry Long was Ad Art's president. During Long's deposition, he testified that he recalled discussing the sign's development and design with MGM's point man on the project, Fred Benninger. Although Benninger was the point man, nothing in the record suggests that he was involved in the sign's design. In fact, Long testified that it was Ad Art's employees, not MGM's, who oversaw the project's development, including structural integrity and design. While other contractors laid the concrete foundation and assisted in erecting the steel pylon, Ad Art manufactured the sign itself and was responsible for mounting it on top of the pylon. More

specifically, Long testified that Gordon Kitto was the project manager, Paul Brengle was the engineer, and Jack Dubois was the designer, all of whom were employed by Ad Art. Long testified further that the sign was fabricated in sections at Ad Art's facility in Stockton, California, and then shipped by truck to Las Vegas and assembled on MGM's property, which Long stated "was done by our people."[11] Long clarified this point later noting that "we sold the sign to MGM. They paid us. We erected the sign. They paid us for the sign in full." Thus, the record does not support the finding that "MGM was involved in every aspect of the [sign's] design."

With this in mind, permitting Ad Art to be sued under a theory of strict products liability does in fact further the doctrine's safety objective. In *Greenman v. Yuba Power Products, Inc.*, the California Supreme Court stated that "[t]he purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." 377 P.2d 897, 901 (Cal. 1963). Imposing this cost on manufacturers creates an incentive to produce safer products. This imposition is justified because "the seller . . . has undertaken and assumed a special responsibility toward . . . the consuming public who may be injured by [its products]." Restatement (Second) of Torts § 402A cmt. c.

Here, Ad Art was in the business of manufacturing and designing commercial signs. The record demonstrates that Ad Art manufactured, designed, and sold a commercial sign to MGM, releasing its product into the stream of commerce and thus assuming a duty toward the

---

[11]During his deposition, Long stated that the sign was fabricated in sections, although he could not recall how many.

ultimate user. The ultimate user in this case, Schueler, suffered bodily injury from Ad Art's allegedly defective product while he was servicing the sign for MGM. *See, e.g.*, Restatement Second § 402A cmt. l (providing that strict liability extends to agents or employees of the purchaser of a defective product). Furthermore, Schueler was entitled to assume that the product was fit for its ordinary use, and Ad Art should have known that the sign would be used without inspection for defects. *Greenman*, 377 P.2d at 900 ("A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being."). Therefore, the imposition of strict liability as to Ad Art does further the doctrine's safety objective.

B.

Ad Art also contends that because of the pylon sign's unique nature, it had no opportunity to spread costs. In support of this argument, Ad Art cites to *Queen City Terminals, Inc. v. General American Transport Corp.*, 653 N.E.2d 661, 673 (Ohio 1995), contending that, similar to the defendant in *Queen City*, it was in no better a position to assume the costs associated with injury than MGM because the pylon sign was not a mass-scale enterprise. We conclude, however, that *Queen City* is distinguishable.

In *Queen City*, the defendant (Trinity, Inc.), which manufactured the allegedly defective products (train cars), had only limited involvement in the product's design. 653 N.E.2d at 665, 772. In fact, the train cars were developed by a company called GATX, which "own[ed] the design and [retained the] sole right to manufacture" the cars. *Id.* at 672. GATX commissioned Trinity to manufacture the train cars as part of a one-time commission. *Id.* Thus, Trinity had never previously built the GATX

train cars, nor is it clear that it had ever built anything comparable. *Id.* Therefore, Trinity was not engaged in the business of making or selling the particular product in question, and indeed only manufactured the train cars as part of a one-time commission. As a result, Trinity had no opportunity to spread costs. The *Queen City* court also noted that the plaintiff's "experts were *heavily* involved in the manufacturing process." *Id.* (emphasis added). Specifically, plaintiff's experts "requested and received plans for the [train cars], and subsequently "subjected [those plans] to . . . scrutiny," which involved examination by hundreds of engineers and outside consultants. *Id.* at 672-73.

By contrast, the record in this case indicates that Ad Art fabricated the pylon sign, transported it to Las Vegas in sections, and installed it, which "was done by [Ad Art's] people." The record also shows that Ad Art, not MGM, was heavily involved in the sign's design. And unlike the *Queen City* defendant, it is beyond doubt that Ad Art was in the business of making, selling, and designing commercial signs that were similar to the one in question. As a result, Ad Art had the opportunity and the incentive to design and develop safe products, as well as the occasion to spread costs.

Furthermore, Ad Art's reliance on *Queen City* stretches the case beyond its logical bounds, as the court's holding is fact specific. In particular, the court stated that "[t]his holding is not meant to be a panacea for all manufacturers of defective products, but is instead intended to address the *rare factual circumstance where the purchaser and lessee of a product are heavily involved in the manufacturing process of the defective item.*" *Id.* at 673 (emphasis added). Here, the record does not support the proposition that MGM was "heavily involved in the manufacturing process"

COURT OF APPEALS
OF
NEVADA

(O) 1947B

28

of the pylon sign. Therefore, we conclude that the analogy to *Queen City* is inapposite.

### C.

Ad Art further contends that because the sign was custom-built, it was in no better position than MGM to know of the manufacturer's negligence. As already articulated, this argument is unsupported by the record and relevant authorities. Under *Calloway*, the third policy objective of strict products liability focuses on "concerns about a plaintiff's ability to prove a remote manufacturer's or seller's negligence." 116 Nev. at 268, 993 P.2d at 1271. Here, Ad Art's employees designed and engineered the MGM pylon sign. The sign was then fabricated in sections at Ad Art's facility in Stockton, California, and then shipped by truck to Las Vegas where it was assembled "by [Ad Art's] people."

Furthermore, there is nothing in the record indicating that MGM or its employees were heavily involved in the sign's manufacturing or design. Indeed, the record supports a contrary conclusion by demonstrating that Ad Art was significantly involved in every step of the process, including design, production, delivery, and installation. Thus, neither Schueler nor MGM were in a position "to prove that a particular party in the product-supply chain . . . failed to exercise due care." Graham, *Strict Products Liability*, *supra*, at 568-69. Therefore, we are unpersuaded by Ad Art's arguments and conclude that the application of strict products liability in this instance does further the policy objectives of the doctrine.

### VII.

Finally, at oral argument, Ad Art theorized that the pylon sign is more akin to an immovable real estate fixture and therefore exempt from strict products liability. We also find this argument unpersuasive. First,

fixtures are not exempt from the doctrine of strict liability. *See, e.g., In re Eighth Judicial Dist. Asbestos Litig.*, 129 N.E.3d 891, 901 (N.Y. 2019) ("[T]he fact that something is taxable as real property *does not render it outside the realm of strict liability.* In fact, other affixed taxable real property under the Real Property Tax Law, such as *elevators and large turbines*, have nevertheless been subject to strict products liability claims . . . ." (emphasis added)); *Keck*, 830 So. 2d at 6 (explaining that items that are *not* "part of the structural integrity of the house or building" are products for purposes of strict liability); *Boddie*, 455 N.E.2d at 149 (concluding that a custom conveyor system housed in a factory was a product for purposes of strict liability).

Second, there is no evidence demonstrating that the sign is now suddenly immovable. Indeed, the record clearly establishes that Ad Art manufactured the pylon sign in California and then transported it to Las Vegas in sections, where it was fully assembled and installed at Ad Art's direction atop the pylon. And, at oral argument, Ad Art acknowledged that the sign could indeed be moved. It stands to reason, therefore, that even though it may be difficult and expensive, the sign could be dismantled from the pylon and moved once again. In fact, if MGM ever sold its hotel casino to another owner to operate under another name, one can imagine that the new operator would do exactly that: remove MGM's sign and mount its own sign on top of the existing pylon.

And last, whether or not the sign is movable is not dispositive of the ultimate legal question. By focusing on transportability, Ad Art appears to imply that strict liability applies only to personal chattels, as

contrasted with real chattels (i.e., fixtures).[12] But the Second Restatement does not limit the application of strict liability to personal chattels, nor can such a restraint be inferred from the text. Notably, comment a of section 402A states that this section deals with "suppliers of chattels," making no distinction between personal and real chattels, and comment d strongly indicates that fixtures (i.e., real chattels) are squarely within the contemplation of section 402A.[13] Thus, we reject the notion that fixtures are necessarily immune from claims sounding in strict products liability.[14]

---

[12]*Chattel, Black's Law Dictionary* (4th ed. 1951) (defining chattel as "[a]n article of personal property; any species of property not amounting to a freehold or fee in land," and distinguishing personal chattels from real chattels); *see also Real Chattels, Black's Law Dictionary* (5th ed. 1979) ("An interest in real estate less than a freehold or fee. See also Fixtures.").

[13]Comment d states, "the rule stated [herein] applies to . . . a water heater [and] a gas stove." *Cf. Fixture, Black's Law Dictionary* (5th ed. 1979) ("Goods are fixtures when they become so related to particular real estate that an interest in them arises under real estate law; *e.g.*, a furnace affixed to a house or other building.").

[14]We also reject Ad Art's reliance on *Dayberry v. City of East Helena*, 80 P.3d 1218 (Mont. 2003), which held that a municipal swimming pool was not a product for purposes of strict products liability, and conclude that *Dayberry* is distinguishable from the instant case on the facts and the law. In particular, the Montana Supreme Court affirmed the trial court, concluding that the municipal swimming pool was not a product for purposes of strict liability because it was "not in the stream of commerce and [was] neither mass-produced [n]or prefabricated." *Id.* at 1221. But, as already discussed, mass production is not a requirement of section 402A, and moreover, the plaintiff in *Dayberry* sued the City of East Helena, not the pool's manufacturer. 80 P.3d at 1219. Thus, consistent with the requirements of section 402A, the claim in *Dayberry* was not viable against the city because the city was not engaged in the business of making or selling swimming pools. Finally, there is no general consensus among courts that pools are not products for purposes of strict liability. *See, e.g.*,

****

Accordingly, we conclude that the MGM pylon sign is a product within the meaning of strict products liability, as the pylon sign falls directly within the contemplation of section 402A of the Second Restatement of Torts.[15] More specifically, large commercial signs, such as the MGM pylon sign, are products for purposes of strict liability, where, as here, they are designed, manufactured, and sold by a party engaged in the business of selling and manufacturing such signs. Further, to the extent that the pylon sign was custom-made for MGM, this alone is insufficient to remove it from the sphere of strict liability, especially because the public policy considerations for applying the doctrine of strict products liability in this case have been satisfied. Therefore, we reverse the district court's

---

*Duggan v. Hallmark Pool Mfg. Co.*, 398 N.W.2d 175, 178 (Iowa 1986) (concluding that the trial court did not err when it submitted to the jury plaintiff's strict liability claim against a pool manufacturer), *superseded by statute on other grounds as recognized in Reed v. Chrysler Corp.*, 494 N.W.2d 224, 230 (Iowa 1992); *see also DeCrosta v. A. Reynolds Constr. & Supply Corp.*, 375 N.Y.S.2d 655, 657 (App. Div. 1975) (providing that the swimming-pool contractor came within the class of persons who could be held responsible on a theory of strict products liability). However, even if we were inclined to accept the proposition that an in-ground swimming pool, like the one in *Dayberry*, is not subject to the doctrine of strict liability, Ad Art has not adequately explained how *Dayberry* analogizes to the facts of this case—which involves a pylon sign, not a near-permanent in-ground pool. Accordingly, we conclude that any reliance on *Dayberry* is misplaced.

[15]In so doing, we express no opinion regarding the viability of Schueler's claim generally. Instead, we conclude only that the MGM sign is a product for purposes of strict liability, and therefore, as a matter of law, Schueler's claim cannot be defeated on this basis.

 

summary judgment in Ad Art's favor and remand for further proceedings consistent with this opinion.[16]

_____, J.
Bulla

We concur:

_____, C.J.
Gibbons

_____, J.
Tao

---

[16]Insofar as the parties raised arguments that are not specifically addressed in this opinion, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

COURT OF APPEALS
OF
NEVADA

(O) 1947B